# Exhibit A



# IN THE 16TH JUDICIAL CIRCUIT COURT, JACKSON COUNTY, MISSOURI

| Judge or Division:<br>CORY LEE ATKINS | Case Number: 2016-CV02520 |
|---|---|
| Plaintiff/Petitioner:<br>ANNETTE BARTLE | Plaintiff's/Petitioner's Attorney/Address:<br>DAVID L. MARCUS<br>BARTLE & MARCUS LLC<br>116 W 47TH ST STE 200<br>vs. | KANSAS CITY, MO 64112 |
| Defendant/Respondent:<br>TD AMERITRADE HOLDINGS CORP<br><br>Nature of Suit:<br>CC Breach of Contract | Court Address:<br>308 W Kansas<br>INDEPENDENCE, MO 64050<br><br>(Date File Stamp) |

## Summons for Personal Service Outside the State of Missouri
### (Except Attachment Action)

| The State of Missouri to: **TD AMERITRADE HOLDINGS CORP**,<br>Alias: | **PRIVATE PROCESS SERVER** |
|---|---|

**4211 S 102ND STREET**
**OMAHA, NE 68127**

*COURT SEAL OF*

*JACKSON COUNTY*

You are summoned to appear before this court and to file your pleading to the petition, copy of which is attached, and to serve a copy of your pleading upon the attorney for the Plaintiff/Petitioner at the above address all within 30 days after service of this summons upon you, exclusive of the day of service. If you fail to file your pleading, judgment by default will be taken against you for the relief demanded in this action.

28-JAN-2020
Date _____ Clerk

Further Information: _____

### Officer's or Server's Affidavit of Service

I certify that:
1. I am authorized to serve process in civil actions within the state or territory where the above summons was served.
2. My official title is _____ of _____ County, _____ (state).
3. I have served the above summons by: (check one)
   - ☐ delivering a copy of the summons and a copy of the petition to the Defendant/Respondent.
   - ☐ leaving a copy of the summons and a copy of the petition at the dwelling place or usual abode of the Defendant/Respondent with _____, a person of the Defendant's/Respondent's family over the age of 15 years who permanently resides with the defendant/respondent.
   - ☐ (for service on a corporation) delivering a copy of the summons and a copy of the petition to _____ (name) _____ (title).
   - ☐ other (describe) _____

Served at _____ (address)
in _____ County, _____ (state), on _____ (date) at _____ (time).

_____
Printed Name of Sheriff or Server

_____
Signature of Sheriff or Server

***Subscribed and Sworn To*** me before this _____ (day) _____ (month) _____ (year)

I am: (check one)
- ☐ the clerk of the court of which affiant is an officer.
- ☐ the judge of the court of which affiant is an officer.
- ☐ authorized to administer oaths in the state in which the affiant served the above summons. (use for out-of-state officer)
- ☐ authorized to administer oaths. (use for court-appointed server)

*(Seal)*

_____
Signature and Title

| Service Fees, if applicable | |
|---|---|
| Summons | $_____ |
| Non Est | $_____ |
| Mileage | $_____ ( _____ miles @ $_____ per mile) |
| **Total** | $_____ |

**See the following page for directions to clerk and to officer making return on service of summons.**

## Directions to Officer Making Return on Service of Summons

A copy of the summons and a copy of the motion must be served on each *Defendant/Respondent*. If any Defendant/Respondent refuses to receive the copy of the summons and motion when offered, the return shall be prepared accordingly so as to show the offer of the officer to deliver the summons and motion and the Defendant's/Respondent's refusal to receive the same.

Service shall be made: (1) On Individual. On an individual, including an infant or incompetent person not having a legally appointed guardian, by delivering a copy of the summons and motion to the individual personally or by leaving a copy of the summons and motion at the individual's dwelling house or usual place of abode with some person of the family over 15 years of age, or by delivering a copy of the summons and petition to an agent authorized by appointment or required by law to receive service of process; (2) On Guardian. On an infant or incompetent person who has a legally appointed guardian, by delivering a copy of the summons and motion to the guardian personally; (3) On Corporation, Partnership or Other Unincorporated Association. On a corporation, partnership or unincorporated association, by delivering a copy of the summons and motion to an officer, partner, or managing or general agent, or by leaving the copies at any business office of the Defendant/Respondent with the person having charge thereof or by delivering copies to its registered agent or to any other agent authorized by appointment or required by law to receive service of process; (4) On Public or Quasi-Public Corporation or Body. Upon a public, municipal, governmental or quasi-public corporation or body in the case of a county, to the mayor or city clerk or city attorney in the case of a city, to the chief executive officer in the case of any public, municipal, governmental, or quasi-public corporation or body or to any person otherwise lawfully so designated.

Service may be made by an officer or deputy authorized by law to serve process in civil actions within the state or territory where such service is made.

Service may be made in any state or territory of the United States. If served in a territory, substitute the word "territory" for the word "state."

The office making the service must swear an affidavit before the clerk, deputy clerk, or judge of the court of which the person is an officer or other person authorized to administer oaths. This affidavit must state the time, place, and manner of service; the official character of the affiant, and the affiant's authority to serve process in civil actions within the state or territory where service is made.

Service must not be made less than ten days nor more than 30 days from the date the Defendant/Respondent is to appear in court. The return should be made promptly and in any event so that it will reach the Missouri Court within 30 days after service.

OSCA (8/2018) SM60 (JAKSMOS) *For Court Use Only*: Document ID# 20-SMOS-61  2 of 2        (2016-CV02520)        Rules 54.06, 54.07, 54.14, 54.20; 506.120 – 506.140, 506.150, 506.500, 506.510 RSMo

Case 4:20-cv-00166-SRB   Document 1-1   Filed 03/04/20   Page 3 of 35

# SUMMONS/GARNISHMENT SERVICE PACKETS
## ATTORNEY INFORMATION

Under the Missouri e-filing system now utilized by the 16th Judicial Circuit Court, once a case has been accepted for filing, a clerk prepares the necessary documents for service. The summons/garnishment is sent to the attorney by an e-mail containing a link so that the filer may print and deliver the summons/garnishment, pleadings and any other necessary documents to the person designated to serve the documents.

Pursuant to State statutes, Supreme Court Rules and Local Court Rules, attorneys are required to print, attach and serve specific documents with certain types of Petitions and other filings.

Please refer to the Court's website for instructions on how to assemble the service packets at:

16thcircuit.org → Electronic Filing Information → Required Documents for Service – eFiled cases → Summons/Garnishment Service Packet Information.

Please review this information periodically, as revisions are frequently made. Thank you.

Circuit Court of Jackson County

Electronically Filed - Jackson - Independence - January 23, 2020 - 11:51 AM

## IN THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI
## AT INDEPENDENCE

| | |
|---|---|
| Annette Mackey Bartle, on behalf of herself and other members of the putative class, | Case No. |
|       Plaintiff, | |
| v. | |
| TD Ameritrade Holdings Corp. | |
|       Defendant. | |

### CLASS ACTION PETITION

For her Class Action Complaint against TD Ameritrade Holdings Corp. ("TD Ameritrade"), Plaintiff Annette Mackey Bartle ("Plaintiff") states and alleges as follows:

### INTRODUCTION

1.      This is an action for breach of contract and unjust enrichment.

### THE PARTIES

2.      Plaintiff is a natural person residing in Jackson County in the State of Missouri. At all times herein relevant, Plaintiff owned a retail brokerage account at Scottrade, Inc. Plaintiff brings this action on behalf of herself and a class of similarly-situated individuals and entities as defined herein.

3.      Defendant TD Ameritrade is a corporation organized under the laws of the State of Delaware, with its principal place of business at 4211 S. 102nd St., Omaha NE 68127. It can be served with process through its registered agent, Corporation Services Company, Corporation Trust Center, 1209 Orange St., Wilmington, DE 19801.

4.      TD Ameritrade acquired Scottrade, Inc. and Scottrade Financial Services, Inc. in 2017, and on information and belief, assumed the liabilities of these entities as part of

1

the acquisition. Scottrade, Inc. is a wholly owned subsidiary of Scottrade Financial Services, Inc. Collectively, Scottrade, Inc. and Scottrade Financial Services, Inc. will hereinafter be described as "Scottrade."

## JURISDICTION AND VENUE

5.    This Court has personal jurisdiction over TD Ameritrade because it, and companies it acquired, transacted business in this State and entered into contracts in this State.

6.    Venue is proper in this Court pursuant to R.S.Mo. § 508.010 because there is no count alleging a tort, and the defendant is a nonresident of the state.

## FACTUAL ALLEGATIONS

### *The Basics of Investing*

7.    Investment securities such as stocks, bonds and exchange-traded funds typically are bought and sold through a brokerage firm.

8.    Buying or selling of securities through a brokerage firm requires a brokerage account.

9.    A brokerage account is an arrangement where an investor deposits money with the firm and the firm make trades on the investor's behalf.

10.    Although the firm executes the orders, the assets belong to the investor, who typically must claim as taxable income any capital gains incurred from the account.

11.    In general, there are two types of brokerage accounts: cash accounts and margin accounts.

12.    In a cash account, all transactions must be made with available cash or long positions. When buying securities in a cash account, the investor must deposit cash to settle

2

the trade or sell an existing position on the same trading day, so cash proceeds are available to settle the buy order.

13.     In a margin account, the account owner can borrow against the value of the assets in the account to purchase new positions or sell short. Margin also can be used to make cash withdrawals against the value of the account as a short-term loan. When a margin balance is created, the outstanding balance is subject to a daily interest rate charged by the brokerage firm. These rates are based on the current prime rate plus an additional amount that is charged by the firm.

14.     Although a margin account allows the account owner to borrow against the value of asserts in the account to purchase securities, this is a purely optional feature.  The account owner may choose to utilize this feature periodically, regularly or not at all.  Even where an account owner has been approved for margin borrowing, he or she can continue to purchase new securities using the assets in his or her account rather than borrowing from the brokerage firm.

15.     Indeed, while a margin account can be viewed as a distinct type of brokerage account, it is equally accurate to view a margin account simply as a cash account with the added option of margin borrowing.

*Short Selling*

16.     One reason an investor may choose to open a margin account is to facilitate short selling.

17.     Short selling allows an investor to profit from the decline in the price of a particular security.

3

18.     To execute a short sale, an investor borrows stock through their brokerage company from someone who owns it. He or she then sells the stock, retaining the cash proceeds.

19.     The investor hopes that the price will fall over time, providing them an opportunity to buy the stock at a later date (up to the "expiration date") at a lower price than the original sale price. Any money remaining after buying back the stock is profit to the investor.

20.     By way of example, if an investor believes the price of ABC Company stock is going to decrease, he or she may borrow 10 shares of ABC at the current market price of $100 and sell it to another investor at that same time for that same market price. If the stock goes down to $90, the investor could buy the 10 shares back at $90. The short seller would then return the borrowed shares to the lender, who must accept the return of the same number of shares as was lent despite the fact that the market value of the shares has deceased. The short seller nets a profit of $10 per share. If, on the other hand, the price has risen to $120 at the expiration date, the short seller will be obligated to buy the share at that price, and he will lose $20 per share.

21.     Prior to the financial crisis in 2008, investors could engage in "naked" short-selling, which is the practice of short-selling a tradeable asset without first borrowing the security. Currently, however, shares must be borrowed in order for a short sale to take place.

22.     This "borrowing of shares" is facilitated by the brokerage firm; the borrowed shares may come from another investor's account, from shares being held in the brokerage firm's inventory, or even from another brokerage firm (through inter-brokerage firm lending

4

arrangements). Regardless of the where the shares come from, however, the brokerage firm technically is the lender.

23.     Because the brokerage firm is making a loan (in the form of stock) to the short seller, it requires collateral. This collateral is derived in part from the proceeds of the short sale (the sale of the borrowed stock to another investor). The brokerage firm withholds these proceeds rather than distributing them to the short seller and utilizes them to secure the loan. By regulation (Regulation T), a short sale must be collateralized by the short sale proceeds plus an additional margin requirement of 50% of the value of the short sale.

24.     The brokerage firm typically charges a transaction fee for facilitating a short sale, and also charges interest on the loan for as long as it remains outstanding (i.e., as long as the stock remains loaned out and has not been replaced or "covered"). A typical interest rate is U.S. prime rate plus 2%.

*The Unwitting Participant*

25.     Oftentimes, short selling involves an often-unwitting participant: the record owner of the borrowed shares.

26.     It is not uncommon for a brokerage firm to borrow shares from another investor's account to facilitate a short sale. This borrowing/lending of shares is referred to as "hypothecation," and typically is allowed by the brokerage account agreement.

27.     Where shares are hypothecated from an investor's account, the account owner loses the voting rights associated with those shares as well as any dividends that were payable during the time the loan was outstanding. In the case of hypothecated bonds and bond funds, the account owner loses the right to receive interest.

5

28.     Brokerage firms typically attempt to make up for lost dividends and interest with substitute payments to the account owner. Importantly, these substitute payments are not dividends or interest; they are monetary payments in lieu of the dividends or interest the account owners otherwise would have received for the shares they owned.

29.     There is a specific line for these substitute payments on IRS Form 1099-MISC– Line 8, "Substitute Payments in Lieu of Dividends or Interest." This is where the brokerage firm reports to the account owner and the IRS any payments of $10 or more the account owner received instead of receiving dividends or tax-exempt interest.

30.     There is an important distinction between substitute payments and dividends and interest. Substitute payments are taxed as ordinary income at rates that can be as high as 37% depending on the taxpayer. Dividends, on the other hand, are taxed at a maximum rate of 20%. And interest may not be taxed at all where the underlying investment is a municipal bond or municipal bond fund.

31.     This difference in tax treatment can dramatically impact the investment earnings of an account owner. By way of example, assume a brokerage firm borrowed 10 shares of ABC Company from an account owner and lent those 10 shares to a short seller for one year. During that year, ABC Company paid $1 in dividends for each outstanding share. Instead of receiving those dividends, the investor received $1 in "substitute payments in lieu of dividends." If the investor's other ordinary income qualifies them for the highest income tax bracket, they will pay 37 cents in income taxes on every $1 in substitute payments. In sharp contrast, they only would have paid 20 cents in income tax on each $1 in dividends. They lost 17 cents on every share. Stated another way another way, in this example, the account owner lost 17% of the profit they would have received on dividend income.

32.     Some brokerage firms attempt to compensate for this difference in tax treatment by providing a credit to the account owner.  This credit typically is calculated based on a predetermined formula which replicates the account owners' additional tax liability.  The credit is reported as "Other income" on line 3 of IRS Form 1099-MISC.

*Scottrade*

33.     Plaintiff and the class owned brokerage accounts at Scottrade.

34.     These accounts were governed by the Scottrade Brokerage Account Agreement (the "Agreement"), attached hereto as Exhibit A.

35.     Scottrade hypothecated securities in these accounts during the class period and made substitute payments in lieu of the dividends and/or interest that Plaintiff and the class otherwise would have received.

36.     The hypothecated securities include stocks, municipal bonds, and exchange traded funds that are comprised of stocks or municipal bonds.

37.     Scottrade failed to credit these accounts an amount to compensate for the fact that substitute payments, unlike dividends and interest on municipal bonds, are taxed as ordinary income.

38.     Scottrade failed to provide class members with confirmations when securities in their accounts were hypothecated.

39.     As a result of this failure, class members could not and did not know in real time whether, when or which securities in their accounts were hypothecated.

40.     Because class members could not and did not know in real time whether, when or which securities in their accounts were hypothecated, they could not modify their investment strategies to compensate for the effect of such hypothecation.

7

41.     Because class members could not and did not know in real time whether, when or which securities in their accounts were hypothecated, they could not take steps to ensure they received payments in lieu of any qualified dividends or tax-exempt interest they were entitled to receive but did not receive as a result of the hypothecation.

42.     Because class members could not and did not know in real time whether, when or which securities in their accounts were hypothecated, they could not take steps to ensure they received a credit to offset the differing tax treatment afforded payments in lieu of qualified dividends or tax-exempt interest and actual qualified dividends and tax-exempt interest.

43.     Through these and other actions more fully described herein, Scottrade breached its contractual and statutory obligations.

## **Class Action Allegations**

44.     Plaintiff brings this action pursuant to Rule 52.08(b)(2) & (3) of the Missouri Rules of Civil Procedure.  In the event this case is removed to federal court, the following allegations also are meant to satisfy Fed.R.Civ.P. 23(b)(2) & (3).

45.     Plaintiff brings this action on behalf of herself and all persons and entities who (a) owned a Scottrade brokerage account, and (b) had securities hypothecated from that account during the ten-year period preceding the filing of this action (the "class period"), and (c) received a substitute payment in lieu of dividends and/or interest in connection with the hypothecated securities, and (d) failed to receive an annual credit to compensate for the fact that substitute payments are taxed as ordinary income. Excluded from the class are all judicial officers presiding over this or any related case.  The class definition also excludes all shareholders, officers and employees of Scottrade and TD Ameritrade.  Plaintiff reserves the right to modify this class definition as discovery or other case circumstances warrant.

8

46.     Although the exact number of class members is presently unknown, Plaintiff alleges the class as presently defined will number in the tens if not hundreds of thousands.

47.     There are questions of law and/or fact common to the Plaintiff and the class members, including but not limited to:

        a.      Whether Scottrade was contractually obligated to avoid causing its account owners losses through its hypothecation activities;

        b.      Whether Scottrade was contractually obligated to credit account owners who received substitute payments when their shares were hypothecated with an amount to compensate them for the fact that substitute payments, unlike dividends and interest on municipal bonds, are taxed as ordinary income.

48.     Plaintiff's claims are typical of the claims of absent class members in that Plaintiff, like all the absent class members, owned a brokerage account at Scottrade, had securities hypothecated from that account, received substitute payments in lieu of dividends or interest, and failed to receive an annual credit to compensate for the fact that substitute payments are taxed as ordinary income.

49.     Plaintiff is a member of the class she seeks to represent.

50.     Plaintiff is an adequate class representative in that, as a member of the class, her interests are aligned with those of the class.

51.     There are no individual conflicts that would prevent Plaintiff from adequately representing the class.

52.     Plaintiff has retained competent counsel experienced in class action litigation.

53.     Class certification is proper because common questions of fact and law predominate over questions that may affect only individual members of the class.

9

54.     A class action presents a superior form of adjudication over individual litigation.

55.     The costs of litigating this action against TD Ameritrade, in comparison to the recovery or relief sought, would make individual litigation impracticable. In addition, forcing individual litigation would risk the result of inconsistent rulings.

56.     This class action is manageable. The proposed class represents an identifiable community that can be readily identified, and the relief sought is one that can be overseen by this Court.

## CAUSES OF ACTION

### COUNT I: Breach of Contract
### (Losses Resulting from Hypothecation)

57.     Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

58.     The Scottrade Brokerage Account Agreement stated in pertinent part as follows (emphasis added):

> "**Loan of Securities.** We are authorized to lend ourselves, as principal or otherwise, or others any securities held by us in your Account and we shall have no obligation to retain under our possession and control a like amount of such securities. In connection with such loans, we may receive and retain certain benefits (including interest on collateral posted for such loans) to which you shall not be entitled. In certain circumstances, such loans may limit, in whole or in part, your ability to exercise voting rights of the securities lent."

> "**Pledge of Securities, Options and Other Property.** All securities and other property now or hereafter held, carried or maintained by us in or for your Account may, from time to time without notice to you, be pledged, repledged, hypothecated or re-hypothecated by us, either separately or in common with other securities and other property. The values received may be greater than the amount you owe us. **Any losses**, gains or compensation **resulting from these activities will not accrue to your brokerage Account.** We are required under SEC rule 15c3-3 to retain in our possession and control all fully paid-for securities. Securities used as Collateral for

10

Margin Loans are not fully paid for and therefore are not subject to the same obligation."

59.     The Scottrade Brokerage Account Agreement did not warn account owners that they would not receive dividends for stocks and stock funds that were hypothecated, and did not warn account owners that they would not receive interest payments for bonds and bond funds that were hypothecated.

60.     The Agreement did not warn account owners that receiving substitute payments instead of receiving dividends or interest payments could increase their tax liability.

61.     Scottrade promised account owners that they would not suffer any losses from Scottrade's hypothecation activities.

62.     Scottrade failed to honor this promise. Account owners **did** suffer losses from Scottrade's hypothecation activities. Account owners received substitute payments in lieu of qualified dividends and/or tax-exempt interest. These payments were taxed as ordinary income rather than receiving more-favorable tax treatment. This differing tax treatment negatively affected the returns associated with these investments.

63.     By causing and allowing Account Owners to suffer losses from Scottrade's hypothecation activities, Scottrade breached the Scottrade Brokerage Account Agreement.

64.     As a result of this breach, Plaintiff and the class suffered damages in an amount to be determined at trial.

### COUNT II:  Unjust Enrichment
### (Failure to Provide a Credit)

65.     Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

11

66.     If it is determined that Scottrade did not have a contractual obligation to give account owners a credit to cover the additional expense they incurred as a result of shares being lent from their accounts, then Scottrade was unjustly enriched by failing to give such credit.

67.     Scottrade received a benefit from class members by being able to lend shares from account owners' accounts and to make substitute payments to account owners in lieu of qualified dividends or tax-exempt interest.

68.     Scottrade knew about and appreciated that benefit.

69.     Scottrade (and TD Ameritrade, after its acquisition of Scottrade), accepted and retained this benefit under such circumstances as to make it inequitable for Scottrade and TD Ameritrade to retain the benefit without payment of its value.

70.     Plaintiff and the class seek equitable relief in the form of an Order requiring TD Ameritrade to pay them the value of this benefit.

### COUNT III:  Declaratory Judgment

71.     Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

72.     An actual and justiciable controversy exists between Plaintiff and TD Ameritrade concerning its rights and obligations relative to hypothecating securities.

73.     Plaintiff maintains that TD Ameritrade must make a substitute payment to the account owner in lieu of the dividends or interest the account owner would have received from the hypothecated securities, and must give the account owner a credit to offset the fact that substitute payments are taxed as ordinary income.

74.     In sharp contrast, TD Ameritrade has demonstrated through its actions that it believes it need not make a substitute payment to the account owner in lieu of the

12

dividends or interest the account owner would have received from the hypothecated securities, and need not give the account owner a credit to offset the fact that substitute payments are taxed as ordinary income.

75.     Plaintiff is entitled to a declaration clarifying TD Ameritrade's rights and obligations in this regard so that, going forward, Plaintiff can make intelligent and informed investment decisions including the decision where to maintain a brokerage account.

## **PRAYER FOR RELIEF**

Plaintiff and the class pray for judgment in their favor as follows:

A.      An Order certifying Plaintiff's claims for class action treatment under Rule 52.08(b)(2) and/or (b)(3) of the Missouri Rules of Civil Procedure or, in event this case is removed to federal court, an Order certifying Plaintiff's claims for class action treatment under Fed.R.Civ.P. 23(b)(2) and/or Rule 23(b)(3);

B.      Judgment in favor of Plaintiff and the class on the claim that Scottrade breached the Scottrade Brokerage Account Agreement by engaging in hypothecation activities that caused account owners to suffer losses.

C.      Judgment in favor of Plaintiff and the class on the claim that Scottrade and TD Ameritrade were unjustly enrichment by retaining the benefit of hypothecating securities from class members' accounts while making them shoulder the additional expense associated with such hypothecation;

D.      Declaratory judgment in favor of the claim for Plaintiff and the class that TD Ameritrade must make a substitute payment to the account owner in lieu of the dividends or interest the account owner would have received from the

hypothecated securities, and must give the account owner a credit to offset the fact that substitute payments are taxed as ordinary income;

E.  An award of damages in an amount to be determined at trial;

F.  An award of equitable relief as appropriate for the claims asserted, including disgorgement of profits received by Scottrade and TD Ameritrade when hypothecating securities from account owners' accounts without sending out confirmations of the securities transactions;

G.  An award of the reasonable costs and attorney's fees Plaintiff and the class incurred in bringing this action; and

H.  Such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff and the class hereby demand trial by jury on all issues so triable.

Respectfully Submitted,

BARTLE & MARCUS LLC
By /s/ David L. Marcus
    David L. Marcus, MO Bar #47846
    BARTLE & MARCUS LLC
    116 W. 47th Street, Suite 200
    Kansas City, MO 64112
    Telephone: 816.256.4699
    Fax: 816.222.0534
    Dmarcus@bmlawkc.com

    and

THE LAW OFFICE OF JARED A. ROSE
    Jared A. Rose, MO Bar #60128
    919 West 47th Street
    Kansas City, MO 64112
    Phone: 816.221.4335
    Fax: 816.873.5406
    jared@roselawkc.com

**ATTORNEYS FOR PLAINTIFF**

14

**2016-CV02520**

# Scottrade Brokerage Account Agreement
# Terms and Conditions

By opening a brokerage account or accounts at Scottrade, Inc. ("Scottrade," "we," "our" or "us"), you acknowledge and represent that you have read and understand the Scottrade Brokerage Account Agreement (the "Agreement") below and agree to be bound by its terms. This Agreement includes the separate disclosures and notices ("Addendums") referenced in and provided with this Agreement. This Agreement governs each brokerage account that you open or request to be opened with us (each "Account").

**1. Legal Capacity to Enter Into Agreements.** You are of full legal age in the state or jurisdiction in which you reside and have the capacity to enter into this Agreement.

**2. Accuracy of New Account Application and Credit Information.** The information that you have provided us is current, accurate, truthful and complete. No one except the person(s) listed on the Brokerage Account Application ("Application") has an interest in the Account being applied for. You agree to provide us with an updated Application promptly upon any material changes in any such information. You also agree to notify us in writing if you are or become: employed or affiliated with a broker-dealer, a U.S. stock exchange or the Financial Industry Regulatory Authority ("FINRA"); or an officer, director, 10 percent shareholder, control person or affiliate of a U.S. publicly traded company. You authorize us to make inquiries to consumer or credit reporting agencies, financial institutions, employers and/or any other source we believe necessary for the purpose of verifying your identity (as required by federal law) and creditworthiness (as well as your spouse's if you reside in a community property state). You acknowledge that your credit score may be impacted when Scottrade accesses your credit file. You also acknowledge that Scottrade may provide information (e.g. negative account information of unsecured debts) regarding your performance under this Agreement to these agencies. You understand that, upon your written request, we will tell you whether we requested a credit report and provide the name and address of the agency that furnished it.

**3. Account Types.** You understand that you are responsible for selecting the Account type (e.g. single, joint, fiduciary, retirement, individual retirement or business type Accounts) that is appropriate for your needs and circumstances. You also understand that certain Account types may be eligible for (or restricted from) certain services offered by Scottrade.

**a) Joint Accounts.** For joint accounts, each joint account holder agrees that each joint account holder shall have authority, without notice to the other joint account holder to: (i) buy and sell securities, options, or other investment products on margin, or otherwise, depending on the type of account; (ii) receive confirmations, statements and communications of every kind related to the account; (iii) receive and dispose of money, securities and/or other property in the account; (iv) make, terminate, or agree to modifications of this Agreement; (v) waive any of the provisions of this Agreement; and (vi) generally to deal with us as if each joint account holder alone was the sole holder of the account. We will not have responsibility for notifying other joint account holders of the actions of any other joint account holder. Each joint account holder agrees that notice to any joint account holder shall constitute notice to all joint account holders. Each joint account holder further agrees that he or she shall be jointly and severally liable to us with respect to all matters relating to the account. We may follow the instructions of any of the joint account holders concerning the account and make delivery to any of the joint account holders of any and all securities and/or other property in the account, and make payments to any of the joint account holders, of any or all monies in the account as any of the joint account holders may order and direct, even if such deliveries and/or payments shall be made to only one of the joint account holders personally.

In the event that we receive notice of a dispute between or conflicting instructions from joint account holders, we may (but are not required to) place restrictions on the account, including restrictions on withdrawals or transfers from an account, until we receive satisfactory documentation that the dispute has been resolved or all joint account holders give us instructions. In the event of the death of any of the joint account holders, the surviving joint account holders shall immediately give us notice. The estate of any deceased joint account holder shall be liable and each survivor will be liable, jointly and severally, to us for any debt or loss in the account or debt or loss incurred in the liquidation of the account or the adjustment of the interests of the joint account holders. Unless the joint account holders indicated to the contrary when the account was opened, we may presume that it is the express intention of the joint account holders to hold the account as joint tenants with rights of survivorship. In the event of the death of any of the joint account holders, the entire interest in the account shall be vested in the surviving joint account holders on the same terms and conditions as theretofore held, without in any manner releasing the deceased joint account holder's estate from liability.

**b) Fiduciaries.** With regard to fiduciary accounts, a fiduciary is a person or entity authorized to make decisions with respect to an account on behalf of the Account's beneficial owners, including a trustee, custodian of a UGMA or UTMA, conservator, guardian, executor, administrator, attorney-in-fact, or investment advisor or other person to whom you have granted trading authority over an Account. You understand and agree that Scottrade does not review any action or inaction by a fiduciary with respect to an Account and is not responsible for determining whether a fiduciary's action or inaction satisfies the standard of care applicable to such fiduciary's handling of the Account. You further understand and agree that Scottrade is not responsible for determining the validity of a person's or entity's status or capacity to serve as a fiduciary. You agree to hold Scottrade and its officers, directors, employees, agents and affiliates harmless from any liability, claim, or expense (including attorneys' fees and disbursements), as incurred, for the actions or non-actions of your fiduciary.

**4. Identity Verification for Anti-Money Laundering Purposes.** We are required by Federal law to verify the identity of each account owner. Scottrade may ask you to provide various identification documents prior to opening an Account. Addendum 1 to this Agreement is our "Customer Identification Program Notice." It describes in general the identification process. You acknowledge that you have received and read Addendum 1.

**5. Account Approvals and Maintenance.** We may reject your Application, close or restrict your Account for any reason, in our sole and absolute discretion without disclosing the details of that decision. We may require that you provide us additional information or documentation in order for us to continue carrying your Account. You acknowledge that we may, at any time in our sole and absolute discretion, restrict trading, disbursements, transfers or take no action in your Account. Scottrade may amend, change, revise, add or modify (amendments) the Agreement at any time. The most current Agreement will be posted to our Web site *www.scottrade.com*. You understand that this Agreement cannot be modified by any verbal statements or written amendments that you seek to make to the Agreement without written acceptance from the General Counsel of Scottrade.

**6. No Advice and No Recommendations.** You acknowledge that we do not and will not give investment, legal or tax advice or make securities recommendations. You agree that you are a self-directed investor and all orders entered are unsolicited and based on your own investment decisions or the investment decision of your duly authorized representative. You agree that neither Scottrade nor any of its employees may be (nor should any duly authorized representative and that you will neither solicit nor rely upon Scottrade or any of its employees for any such advice. You understand that you are solely responsible for all orders entered, including but not limited to trade qualifiers, the number of trades entered, the suitability of any trade(s), investment strategies and risks associated with each trade, and will not hold Scottrade or any of its employees liable for those investment decisions. You further understand that we do not and will not review the appropriateness or suitability for you of any transactions implemented or investment strategies employed in your Account. You hereby agree to hold Scottrade and its officers, directors, employees, agents and affiliates harmless from any liability, financial or otherwise, or expense (including attorneys' fees and disbursements), as incurred, as a result of any losses or damages you may suffer with respect to any such decisions, instructions, transactions or strategies employed in your Account by you or your duly authorized representative, or as a result of any breach by you of any of the covenants, representations, acknowledgments or warranties herein.

**7. Fees, Commissions and Account Minimums.** You agree to pay the brokerage commissions, charges, taxes or other fees as set forth in our then-current Commission Schedule as applicable to the pricing structure of your Account (e.g. Internet or Non-Internet Account) and the type of transactions and services you receive. Scottrade's Commission Schedule is available on our Web site. We may amend our Commission Schedule at any time by posting the changes to our Web site. You understand that Scottrade may require a minimum deposit to open an Account and that you also may be required to maintain a minimum deposit amount. Commissions are charged on a per order basis. Limit orders executed over multiple days and orders modified after a partial execution on the same day will be treated as separate orders for commission calculation purposes.

**8. Purchases and Sales.** To execute purchase orders, we generally require that your Account contain available funds equal to or greater than the purchase price of the securities. To execute sell orders, we generally require that securities be long in your Account in good deliverable form. You agree that any purchase or sell order accepted (inadvertently or otherwise) by us without sufficient funds or negotiable certificates, respectively, in your Account, will be subject to liquidation in the case of a purchase order, or buy-in in the case of a sell order, at your expense. In the event full funds are not available in your Account when a purchase order is executed, you promise to pay the full amount due via wire transfer on or before the settlement date for the purchase. In the event a sale order is executed and the securities sold are not in your Account, you promise to deliver all securities sold, on or before settlement date. If such funds or securities are not received on or before the settlement date, we may liquidate your Account and you will be liable for any resulting losses and all associated costs that we incur.

**9. Orders, Executions and Account Statements.** We may route any order authorized by you to any exchange, other market centers where such business is then transacted, or we may execute the order ourselves. You understand that we do not provide you with direct access to the marketplace. You understand, whether you place a market or limit order or other type of order that you will receive a price at which the order is executed in the market. Particularly during periods of high volume, illiquidity, fast movement or volatility in the marketplace, or the placement of large orders, the execution price you receive may differ from the quote published at the time of order entry, and you may receive partial executions at different prices. We do not accept orders for purchase or sale of securities through the mail, commercial carrier or by e-mail. You understand that you are responsible for promptly reviewing upon receipt all trade confirmations and account statements. Such confirmations and statements shall be deemed accepted by you and shall be binding unless you notify us in writing within ten (10) days after transmission to you. You agree that you are responsible for monitoring all open orders. If you place a good–till-canceled ("GTC") order, you understand that the GTC order is subject to our Open Orders Cancel Schedule posted online in our Message Center. Otherwise the open order will remain in force until it is executed, it is cancelled by us because of a corporate action, reorganization or operational reason, or you choose to cancel it.

**10. Late and Corrected Reports.** When your order is executed, you typically receive an electronic message (a "Report") notifying us about the status of the order, including, but not limited to, whether the order had been executed and at what price. However, we do not always receive reports promptly (a "Late Report"). Accordingly, you may then receive a Late Report. You may also receive Reports correcting a previous Report, including errors in execution prices. You acknowledge that you will receive the price at which your order is actually executed in the marketplace even if the Report is late or a Report corrects an incorrect price or term of another Report.

**11. Cancellation and Modification Requests.** You acknowledge that it may not be possible to cancel or modify an order. Any attempt to cancel or modify an order is simply a request to cancel or modify. We are not liable to you if we are unable to cancel or modify an order. You understand and agree that, if an order cannot be canceled or modified, you are bound by any execution of the original order. You further acknowledge that attempts to modify or cancel and replace an order can result in an over-execution of the order, or the execution of duplicate orders, that our systems do not prevent over-execution on duplicate orders from occurring, and that you shall be responsible for all such executions. If you enter a cancellation request, you agree to wait to confirm that the cancellation request has been effected prior to entering a replacement order. You agree not to assume that any order has been executed or cancelled until you have received a Report from us with regard to order execution. You are responsible for knowing the status of your pending orders before entering additional orders. You agree to contact us in the event you are unclear on the status of an order.

**12. Order Routing and Payment for Order Flow.** Consistent with the overriding principle of best execution, we generally route orders for listed and over-the-counter equity securities and options to market centers, including exchanges, securities dealers who make markets over-the-counter, and alternative trading systems such as ECNs. We take a number of factors into consideration in determining where to route customers' orders, including, the speed of execution, quality of executions (price improvement relative to the national best bid offer (NBBO) in any one market center), automatic execution guarantees, the availability of efficient and reliable order handling capability, the liquidity offered by the market center, the level of service provided, and the cost of executing orders. We may receive remuneration from a market center, but remuneration is only a factor when all other factors affecting best execution are equal. U.S. Securities and Exchange Commission (SEC) rules require all brokerage firms to make publicly available quarterly reports describing their order routing practices. These quarterly reports describe how and where customer orders are routed and are available on our Web site. In addition to the quarterly reports above, SEC rules also require brokerage firms, upon a customer's request, to provide information regarding the identity of the market center to which any customer order was routed in the six months prior to the request; whether the order was a directed or non-directed order, and the time of the transaction, if any, that resulted from such order. If you wish to receive the foregoing routing information for any order(s) within the past six months, please contact your local Scottrade branch. We receive remuneration (for example, in the form of per-share arrangements, liquidity rebates, or profit sharing arrangements) for directing customer orders to certain market centers for execution. The source and amount of any compensation received by us in connection with your transaction will be disclosed upon written request. You understand that any remuneration that we may receive for routing orders through various market centers is considered a reduction in our costs and will not accrue to your Account.

**13. Cash Account Restrictions.** Freeriding is the prohibited practice of purchasing and selling a security in rapid succession without meeting the payment obligation under Regulation T of the Federal Reserve Board created by the initial purchase. Freeriding violates Federal Reserve Regulation T and may also violate other securities laws. You understand that freeriding in your Cash Account is prohibited and may result in us restricting or closing your Account.

**14. Payment of Obligations Upon Demand.** You will be liable to Scottrade for the payment for all trades, debit balances, margin calls, or other obligation ("Obligations") owing in your Account. You agree that all orders for the purchase or sale of securities for your Account shall be processed and/or executed with the understanding that an actual purchase or sale is intended and it is your intention and obligation in every case to pay for any purchase or deliver certificates to cover all sales on or before settlement date, whether or not you are in receipt of a trade confirmation. You agree to pay any debit balance (i.e. an Account balance owed to Scottrade) and to satisfy any indebtedness to Scottrade in your Account on demand. Payments (cash, traveler's checks, third party checks or personal checks for investment clubs/limited partnerships/corporations are not generally accepted) or securities submitted to your Scottrade branch need to be made before settlement to allow for transit to our headquarters. You agree that any security sold will be in good deliverable form (properly endorsed, proper denominations, adjusted for all company reorganizations and free of any encumbrances). Debit balances in any Account may be charged interest in accordance with our then-current interest rate schedule for debit balances.

**15. Security for Indebtedness.** All securities, options, credit balances, bank deposit program balances, assets and other property, which we may maintain in or for your Account or otherwise, whether individually or jointly held with others, whether now owned or hereafter acquired, and any proceeds or distributions therefore (collectively, "Collateral"), shall be subject to a lien in our favor for the discharge of all Obligations. You hereby grant us a continuing, perfected, first-priority security interest and right of set-off in all Collateral. Subject to the provisions of any applicable statute, rule or regulation, we may hold Collateral as security for the payment of any Obligations, and we shall have the right to transfer such Collateral from your Account from or to any other Account in which you have an interest, when in our judgment such transfer may be necessary for our protection. In enforcing the lien, we shall have the right to sell, assign, and deliver all or any part of the Collateral in any of your Accounts to satisfy your Obligations or when we otherwise deem it necessary for our protection. If we believe there is inadequate security for your Obligations or upon any event which in our opinion jeopardizes your Account, we shall have the right to: (a) cancel any outstanding orders for the purchase or sale of securities, options, assets or other property; (b) close transactions in your Account; (c) buy-in any securities, options, assets or other property of which your Account may be short; or (d) require you to deposit additional Collateral in accordance with the rules and regulations of the Board of Governors of the Federal Reserve System, or any securities regulatory or self-regulatory body to whose jurisdiction we are subject. We may also, but shall have no obligation to, require you to deposit such additional Collateral as we in our sole and absolute discretion determine is necessary as security for your Obligations. We shall have all rights and remedies available to a secured party under any applicable law in addition to the rights and remedies provided herein. Subject to the provisions of any applicable statute, rule or regulation, we may take any or all of the foregoing actions at any time without prior notice, tender, demand or call, all of which you expressly waive, and regardless of any prior notice or demand by us. You hereby appoint us as your true and lawful agent and attorney-in-fact, with full power to act in your name and on your behalf, with respect to the execution of all instruments and the taking of all action necessary or desirable to effectuate the rights and remedies provided in this Agreement and by applicable law.

**16. Events of Default.** The following shall constitute an "Event of Default": (a) You fail to make payment as and when required pursuant to this Agreement; (b) You fail to provide margin or to perform any other Obligations as and when we require; (c) Any representation or warranty made by you shall have been incorrect or untrue in any material respect when made or repeated or deemed to have been made or repeated; (d) You state that you will not perform any of the Obligations under this Agreement; (e) You default in the performance of any Obligation to us under any agreement now or hereafter entered into; (f) You default in the payment of any indebtedness for borrowed money, or any guaranty of such indebtedness, upon the maturity (including any accelerated maturity) thereof;

(g) You apply for, consent to or are the subject of an application or petition for the appointment of, or the taking of possession by, a receiver, custodian, trustee, liquidator or similar person of all or a substantial part of your property, admit in writing your inability or become unable to pay your debts generally as such debts become due, make a general assignment for the benefit of creditors, file or are the subject of the filing or entry of a petition or order for relief under Title 11 of the U.S. Code or any similar law of any jurisdiction regarding reorganization, liquidation, dissolution, insolvency, or relief of debtors or of an application for a protective decree under the Securities Investor Protection Act of 1970; or (h) We believe that we may be unable to apply without delay property that we are holding or expect to receive from you against any Obligation to us under this Agreement or in connection with any transactions executed by us on your behalf.

**17. Remedies.** Upon the occurrence of any Event of Default, we may, in our sole and absolute discretion and without notice to you: (a) cancel or otherwise liquidate your Account and any position therein or transaction in your Account; (b) setoff any Obligation owed by us to you against any Obligation of yours, or against any Collateral; (c) satisfy any Obligation of yours to us from any Collateral; (d) sell, or be deemed to have sold, any securities, instruments or other property in your Account; and (e) purchase, or be deemed to have purchased, any securities, instruments or other property, in which you have a short position. All purchases or sales pursuant to this Section may be affected in public or private purchases or sales in which we may be the purchaser or seller, in each case, as we may deem appropriate in our sole and absolute discretion and at such price or prices as we may deem satisfactory in our sole and absolute discretion. You are not entitled to any advance notice to any such remedies by us. In our sole and absolute discretion, we may (but are not required to) attempt to notify you or to provide a grace or notice period before we exercise such remedies. However, any such grace or notice period may be shortened or eliminated by us without further notice to you if we believe it is appropriate to do so for our protection. We may exercise remedies under this Section without notice notwithstanding any prior grace or notice period provided to you.

**18. Free Credit Balances, Funds Availability, and Bank Deposit Program.** You understand and agree that Scottade may place and hold your available cash balances in your Scottade brokerage account as free credit balances, in our Bank Deposit Program as described in Addendum 8, or through other arrangements that Scottade may make available. *We may change or replace the above options in our discretion. We may, in our sole and absolute discretion,* pay you interest on any free credit balances awaiting investment. A free credit balance is the sum of the uninvested cash in your Account less the funds required to pay for purchase transactions due to settle on or after the day the free credit balance is to be calculated, charges to your Account, and credit balances that are Collateral for your Obligations. Free credit balances are not bank deposits and are not insured by the FDIC. If you receive interest on these free credit balances, you agree that you maintain the free credit balances in your Account for investment purposes, and not solely for the purpose of receiving interest. We reserve the right to stop paying interest on free credit balances, close your Account or to take any other action necessary if we determine that you are maintaining free credit balances with Scottade solely for the purpose of receiving interest. We may increase or decrease the rate of interest or decide to stop or start paying interest at anytime in our sole and absolute discretion. Our use of credit balances in our business is subject to the limitations of SEC Rule 15c3-3. You have the absolute right to receive, in the normal course of business, any free credit balance and any fully paid securities to which you are entitled, subject to any open commitments in your Account.

**19. SIPC and Other Insurance Coverage.** You understand that we are members of the Securities Investor Protection Corporation ("SIPC") and that SIPC currently protects the assets in your Account up to $500,000, with a limit of $100,000 for cash balances, which are being held for purposes of investment. Cash balances not held for investment purposes (e.g. the sole purpose is to collect interest) may not be covered by SIPC. You acknowledge that these SIPC protections do not cover fluctuations in the market value of your securities. A brochure with the details of SIPC's protections is available at *www.sipc.org* or by calling (202) 371-8300.

**20. Control or Restricted Securities.** Scottade does not generally handle the sale of control or restricted securities. You agree to notify us if you have deposited or seek to deposit any unregistered, restricted, or control securities in your Account. You agree not to enter sell orders with Scottade for securities that are subject to Rule 144 or 145(d) of the Securities Act of 1933. You agree to pay for any loss Scottade may incur in closing out any such intentional or unintentional sales. If you elect to deposit any control or restricted securities in your Account, you understand and agree that you will not sell such securities through your Account.

**21. Responsibility Regarding Certain Securities.** You are responsible for knowing the rights and terms for all securities bought, sold and maintained at Scottade, including but not limited to stock splits, reorganizations, mergers, name changes, symbol changes, dividends (including stock dividends), option symbols, and option deliverables. Scottade may, but is not obligated to, notify you of any upcoming expiration or redemption dates, or take any action on your behalf without your specific instructions except as required by law and the rules of regulatory authorities. Certain securities may grant you valuable rights that may expire unless you take specific action. These securities include bonds, convertible securities, warrants, stock rights and securities subject to exchange offers or tenders. You are responsible for knowing all expiration dates, redemption dates, and the circumstances under which rights associated with your securities may be called, cancelled, or modified. If any such security is about to expire worthless or be redeemed for less than its fair market value and instructions have not been received from you, we may, at our discretion, sell the security and credit your Account with the proceeds. If an Account has an option position on the last trading day prior to expiration that is $0.01 or more in-the-money, the option is subject to automatic exercise. However, Scottade reserves the right at its sole discretion to close any option position prior to expiration date or any position resulting from the exercising/assignment after option expiration. You will be charged a brokerage commission for any such transaction. Scottade is not obligated to take any of these actions and we are not liable for losses should we not do so. Securities traded in the over-the-counter bulletin board and pink sheets and other thinly-traded securities may present particular trading risks in that they can be more volatile and are generally less liquid than securities traded on exchanges. Scottade reserves the right to place restrictions on the trading of such securities, or any other securities for any reason, without prior notice

**22. Communication between Companies and Shareholders.** As required by SEC rules, we will release your name, address, and security positions to requesting companies in which you own shares that are held in your Account, unless we receive notice from you in writing that you object to us providing this information.

**23. Privacy Disclosures.** Addendum 2 to this Agreement is our "Privacy Policy and Security Statement." It describes how we protect your personal and financial information that we collect in the course of providing financial services to you. You acknowledge that you have received and read Addendum 2.

**24. Mutual Fund Investing.** You may invest in a variety of mutual funds in your Account through Scottade. The information and services provided by Scottade are not to be considered an offer to sell or a solicitation of an offer to buy a particular fund. Fund purchases may be subject to investment minimums, and all fund transactions are subject to acceptance by us and/or the fund company. By entering a mutual fund transaction through Scottade, you acknowledge that you have received and read the fund prospectus, which describes the risks associated with the investment. Some mutual funds available through Scottade may impose a sales charge on the purchase of shares of the fund. These charges are known as a "sales load." You may also be able to purchase mutual fund shares without paying a front-end sales load, although you may be charged a "contingent deferred sales charge" (i.e. back-end load) upon the sale or redemption of the shares. These charges may not be included in the fund's performance data. We may receive all or part of a sales load in connection with your investment in the fund's shares. Please consult the fund's prospectus for more information. Some mutual funds offer reductions in front-end sales loads, known as breakpoints, for purchases over certain amounts. In addition, such discounts may be available through Letters of Intent or Rights of Accumulation. You acknowledge that you are solely responsible for determining and obtaining breakpoints and rights of accumulation. Addendum 3 is a Disclosure Statement entitled "Mutual Fund Breakpoint Discount". This document describes various issues in purchasing load mutual funds. You acknowledge that you have received and read Addendum 3. Additional information about mutual fund breakpoints is available from FINRA at its Web site *www.finra.org*. Please consult the fund's prospectus for more information. Some mutual funds impose a marketing distribution fee known as a "12b-1 fee." This fee is included in the computation of the fund's overall expense ratio and is reflected in the fund's performance data. We may receive all or part of the 12b-1 fees in connection with your investment in the fund's shares. Please consult the fund's prospectus for more information.

**25. No-Transaction-Fee Mutual Fund Program.** You may participate in our No-Transaction Fee Mutual Fund Program ("NTF Program") in your Account. This program allows you to invest online in no-load mutual funds through Scottade without paying a sales load or transaction fee. NTF mutual funds purchased through a Scottade broker instead of online are subject to transaction fee set forth on our commission schedule. *We may receive compensation directly from participating fund companies or third parties in payment for the fund distribution services that we provide.* This compensation is included in the fund's overall expense ratio and is reflected in the fund's performance data. Please consult the fund's prospectus for more information. By participating in the NTF Program, you agree to the terms and conditions of the program as set forth in the Important Mutual Fund Information section of our Web site, which is subject to change at any time without prior notice to you. You acknowledge that we may modify or discontinue the NTF program without prior notice to you. By entering into a mutual fund transaction through us, you acknowledge that you have received and read the fund prospectus, which describes the risks associated with the investment. No-load mutual funds that are not part of our NTF program are subject to the transaction fees set forth in our commission schedule.

**26. International Accounts.** We may open Accounts for non-resident aliens that are required to complete a Form W-8 for tax withholding purposes (International Accounts). We do not promote ourselves, nor hold ourselves out, as doing business outside the United States. Since this agreement is not binding until approved and accepted by us in the United States, this agreement shall be deemed to be a contract made in the United States. All services to be performed by us shall be performed solely in the United States in United States dollars. You understand that an International Account must be an Internet Account. A Scottrade office in the United States will service your Account because we do not have offices outside the United States. Notifications will be provided to you solely in electronic form through e-mail and notices posted to your particular Account on Scottrade's Web site.

You further understand that you may only fund the Account with wired funds, personal checks, cashier's checks and/or money orders drawn on United States banks. Our Web site shall not be considered a solicitation for or offering of any investment product or service to any person in any jurisdiction where such solicitation or offering would be illegal.

**27. FINRA Public Disclosure Program.** As a member of FINRA, Scottrade is required to disclose the availability of BrokerCheck, an online tool that provides information on FINRA-registered firms. To access BrokerCheck or download a brochure, go to *www.finra.org*. You can also call the BrokerCheck Hotline at (800) 289-9999.

**28. Arbitration Disclosures. This Agreement contains a predispute arbitration clause. By signing this Agreement, the parties agree as follows:**
    **(A) All parties to this Agreement are giving up the right to sue each other in court, including the right to a trial by jury, except as provided by the rules of the arbitration forum in which a claim is filed.**
    **(B) Arbitration awards are generally final and binding: a party's ability to have a court reverse or modify an arbitration award is very limited.**
    **(C) *The ability of the parties to obtain documents, witness statements and other discovery is generally more limited in arbitration than in court proceedings.***
    **(D) The arbitrators do not have to explain the reason(s) for their award.**
    **(E) The panel of arbitrators will typically include a minority of arbitrators who were or are affiliated with the securities industry.**
    **(F) The rules of some arbitration forums may impose time limits for bringing a claim in arbitration. In some cases, a claim that is ineligible for arbitration may be brought in court.**
    **(G) The rules of the arbitration forum in which the claim is filed, and any amendments thereto, shall be incorporated into this agreement.**

**29. Agreement to Arbitrate Controversies. You agree that any controversy, dispute, claim, or grievance between us, any of our affiliates or our or their shareholders, officers, directors employees, associates, or agents, on the one hand, and you or, if applicable, your shareholders, officers, directors employees, associates, or agents on the other hand, arising out of, or relating to, this Agreement, or any service provided by us, including transactions of any kind made on your behalf through us, shall be resolve by arbitration, in accordance with the rules of the Financial Industry Regulatory Authority (FINRA). If you are not a resident of the United States at the time a controversy subject to arbitration arises, you agree that any arbitration hearing shall be held in St. Louis, Missouri; you consent to the personal jurisdiction of all courts located in the State of Missouri for purposes of enforcing this arbitration agreement and any arbitration award; and you agree that any arbitration proceeding shall be conducted in the English language. If any party unsuccessfully resists confirmation or enforcement of an arbitration award rendered under this agreement, then all costs, attorneys' fees, and expenses incurred by the other party or parties in confirming or enforcing the award shall be fully assessed against and paid by the party resisting confirmation or enforcement of the award.**

**30. Class Actions. No person shall bring a putative or certified class action to arbitration, nor seek to enforce any pre-dispute arbitration agreement against any person who has initiated in court a putative class action; or who is a member of a putative class until: (a) the class certification is denied; or (b) the class is decertified; or (c) the customer is excluded from the class by the court. Such forbearance to enforce an agreement to arbitrate shall not constitute a waiver of any rights under this Agreement except to the extent stated herein.**

**31. Consent to Monitoring and Recording.** You understand that we may, in our sole and absolute discretion, monitor or tape record telephone conversations with you, and you consent to such monitoring or recording. We are not required to record all telephone conversations and do not guarantee that recordings of any particular telephone conversation will be retained or are capable of being retrieved. You acknowledge that we do not accept orders left on voicemail and you agree not to leave any instructions for us on voicemail to enter a securities transaction for you.

**32. E-mail and Electronic Communications.** All e-mail sent to and from us is subject to monitoring, review by or disclosure to someone other than your intended recipient. You acknowledge that there may be delays in e-mail being received by your intended recipient. You agree to hold us harmless for any delay in e-mail delivery regardless of whether the delay was caused by us or a third party. E-mail sent to and from a Scottrade address may be retained by our corporate e-mail system. You agree not to use e-mail to transmit orders to purchase or sell a security and further agree that Scottrade is not liable for any actions taken or any omissions to act as a result of any e-mail message you send to us. Electronic communications with Scottrade via our Web site, wireless device or touchtone service are also subject to monitoring, review by or disclosure to someone other than the recipient and such communications may be retained by Scottrade.

**33. Complaints.** You may direct complaints to your local Scottrade branch or Scottrade's national service center at support@scottrade.com or by calling 1-800-619-SAVE. Written complaints may be sent to Scottrade, Inc., Attn: Compliance Department, 12800 Corporate Hill Drive, St. Louis, MO 63131-1834.

**34. Applicable Rules and Regulations.** You acknowledge that this Agreement and all orders and transactions executed in your Account shall be subject to all applicable federal and state laws and regulations, and the constitution, rules, regulations, customs, usages, rulings and interpretations of the exchange or market and its clearinghouse (if any) where such transactions are executed.

**35. Governing Law and Assignment.** This Agreement and its enforcement shall be governed by the laws of the State of Missouri (without regard to its conflict of law provisions); shall cover individually and collectively all of your Account(s) which you may open or reopen with us; shall inure to the benefit of our successors and assigns, whether by merger, consolidation or otherwise; and shall be binding upon your heirs, executors, administrators, successors, and personal representatives, together with all other persons claiming any legal or beneficial interest through you or in your Account(s). You may not assign the rights and duties hereunder without first obtaining our prior written consent. We may assign our rights and duties under this Agreement and may transfer your Account and this Agreement to our successors and any affiliated assigns without notice, or to any other entity with prior notice to you.

**36. Losses Due to Extraordinary Events; Limitation of Liability.** We shall not be liable for loss caused directly or indirectly by war, strikes, natural disasters, terrorist acts, government restrictions, exchange or market rulings, suspensions of trading, computer or communications line failures, or delays in the transmission of orders due to a breakdown or failure of market centers or transmission facilities or other conditions beyond our reasonable control.

**37. Entire Agreement and Severability.** This Agreement, any attachments hereto, and the terms and conditions contained in statements and confirmations, contain the entire agreement between the parties with respect to the subject matter hereof. If any provision or condition of this Agreement shall be held to be invalid or unenforceable by any court, or regulatory or self-regulating agency or body, such provision shall be deemed modified, or, if necessary, rescinded in order to comply with the relevant court, or regulatory or self-regulatory agency or body. The validity of the remaining provisions and conditions shall not be affected thereby, and this Agreement shall be carried out as if such invalid or unenforceable provision or condition was not contained herein. You acknowledge that you have entered into this Agreement and will enter into transactions in consideration of and in reliance upon the understanding that all such transactions constitute a single business and contractual relationship and have been made in consideration of each other. Accordingly, in addition to any of the other rights and obligations set forth in the Agreement, (a) you agree to perform all of your obligations in respect of each such transaction, (b) we shall be entitled to setoff claims and apply property held by us in respect of any such transaction or otherwise against obligations owing to us in respect of any other such transaction or otherwise, and (c) payments, deliveries and other transfers made by us in respect of any such transaction shall be deemed to have been made in consideration of payments, deliveries and other transfers in respect of any other such transaction, and the obligations to make any such payments deliveries and other transfers may be applied against each other and netted by us.

**38. Notices. To You.** Scottrade will send all notices and other communications relating to your Account to the mailing address or, where applicable, the electronic mail address that you specified on your Brokerage Account Application, subsequent updates to this information and/or post the notices and other communications to a server that you may view when you log into your Account. Scottrade is not responsible for notification problems that may arise from time zone differences or Internet connectivity. Any communication we send to your mailing address by mail, messenger, telegraph, electronic data communication, fax or otherwise or to your electronic mail address is considered delivered to you personally, whether you receive it or not. You agree to inform us promptly of any changes in your mailing address or electronic mail address. **To Us.** All notices and other communications to Scottrade required or permitted under this Agreement shall be in writing and shall be directed to P.O. Box 31759, St. Louis, MO 63131 Attention: General Counsel.

**39. Waiver.** Any failure by us to insist at any time upon compliance with this Agreement or with any of its terms shall not constitute or be considered a waiver by us of any of our rights.

**40. Business Continuity Disclosure.** Addendum 4 to this Agreement is our "Business Continuity Disclosure." It describes our plans for dealing with significant business disruptions that may include power outages, a natural disaster or other disruptions. You acknowledge that you have received and read Addendum 4.

**41. Termination.** You may terminate this Agreement or your Account at any time upon written notice to us, after paying any Obligations you owe to us. You shall remain responsible for all Obligations initiated or authorized by you, including, without limitation, any transactions, debts, and interest as provided under this Agreement, whether arising before or after termination of this Agreement. We may terminate this Agreement or your Account any time, without advance notice, for any reason in our sole and absolute discretion. The terms and conditions of this Agreement will survive termination of your Account and will continue to apply to any disputed or other remaining matters arising from our relationship.

**42. Headings.** The headings contained in each Section are for descriptive purposes only and shall not be deemed to modify or qualify any of the rights or obligations set forth in each such Section.

### INTERNET TRADING

The following provisions apply to Accounts that have access to our Internet trading functionality or online account access.

**43. Consent to Electronic Delivery of Information and Records.** Internet Accounts typically receive account information, including trade confirmations, account statements, proxies, shareholder information, important notices, messages and other records and communications electronically ("electronic delivery"). To receive electronic delivery, you must consent to receive these documents electronically. Once you have consented to receive electronic delivery, documents will be provided to you when we post the information on servers accessible to you on a password-protected portion of our Web site or that of a trusted third-party. By consenting to electronic delivery, you are agreeing to suppress the mailing of paper documents. Your consent to electronic delivery is immediate (although it may take one to two business days for us to process your request) and will remain in effect unless revoked by Scottrade or by you. You may revoke your consent to electronic delivery at any time by visiting the relevant part of our Web site or by notifying us in writing. *This revocation from you is only effective after we receive and process it.* If you wish to receive paper documents through the U.S. mail, you understand that you will be charged fees for delivery of these paper documents. We will provide you with online notification or send you an e-mail regarding the availability of the documents on our Web site. If we are unable to notify you electronically, you understand that we may, in our sole and absolute discretion, discontinue electronic delivery and send you account documents in paper form. You acknowledge that our primary method of communicating with you will be by posting information to servers that you may access from your Account with us online. You agree to check your Account on our Web site regularly as you may not have any other means of knowing that a communication has been delivered to you. There is no charge from us for electronic delivery, but online access and usage charges by your Internet service or access provider may apply. Documents and information will be made available in html or PDF format and may be printed and/or saved. You acknowledge that you can access documents in html or PDF format. You acknowledge that Scottrade Alerts and Messages contain important information affecting your Account and you are responsible for reading these Alerts and Messages and also the other messages, notices, disclosures and other communications on our Web site.

**44. Security and Confidentiality.** You agree that you are the exclusive owner and solely responsible, jointly and severally if applicable, for the confidentiality and protection of your Account number and password that allows you to access our electronic trading systems. You further agree that you will be fully responsible for all activities including brokerage transactions that arise from the use of your Account number and password. You agree to indemnify and hold Scottrade harmless if any other person utilizing your confidential information provides instructions to us that may be contrary to your instructions. You will immediately notify us in writing or by e-mail of any loss, theft or unauthorized use of your Account number and/or password.

**45. Electronic Trading System Risks.** Electronic or computer-based facilities and systems such as those that we provide to you are inherently vulnerable to disruption or failure and may be unavailable to you from time to time. We do not guarantee that any or all of these means will be available to you at a particular time. You agree that if electronic access is unavailable, you must use an alternative means of access to conduct transactions and other account activity, which may delay access to your account or your ability to effect transactions.

**46. LIMITATION OF LIABILITY.** YOU ACCEPT THAT OUR SYSTEM IS "AS IS," AND WITHOUT WARRANTIES, EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, THE IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR USE, PURPOSE OR APPLICATION; TIMELINESS; FREEDOM FROM INTERRUPTION; OR ANY IMPLIED WARRANTIES ARISING FROM TRADE USAGE, COURSE OF DEALING OR COURSE OF PERFORMANCE. UNDER NO CIRCUMSTANCES SHALL WE BE LIABLE FOR ANY PUNITIVE, INDIRECT, INCIDENTAL, SPECIAL OR CONSEQUENTIAL LOSS OR DAMAGES, INCLUDING LOSS OF BUSINESS, PROFITS OR GOODWILL. WE SHALL NOT BE LIABLE TO YOU BY REASON OF DELAYS OR INTERRUPTIONS OF SERVICE OR TRANSMISSIONS, OR FAILURES OF PERFORMANCE OF OUR SYSTEM, REGARDLESS OF CAUSE, INCLUDING, BUT NOT LIMITED TO, THOSE CAUSED BY HARDWARE OR SOFTWARE MALFUNCTION; GOVERNMENTAL, EXCHANGE OR OTHER REGULATORY ACTION; ACTS OF GOD; WAR, TERRORISM, OR OUR INTENTIONAL ACTS. YOU RECOGNIZE THAT THERE MAY BE DELAYS OR INTERRUPTIONS IN THE USE OF OUR SYSTEM, INCLUDING, FOR EXAMPLE, THOSE CAUSED INTENTIONALLY BY US FOR PURPOSES OF SERVICING THE SYSTEM. YOU ACKNOWLEDGE THAT ALTERNATIVE TRADING ARRANGEMENTS ARE AVAILABLE THROUGH US AS LISTED ABOVE BUT WE DO NOT GUARANTEE THAT ALTERNATIVE TRADING ARRANGEMENTS WILL BE AVAILABLE AT A PARTICULAR TIME AND WE WILL NOT BE HELD LIABLE FOR DELAYS IN ENTERTAINING AN ORDER. IN NO EVENT SHALL OUR LIABILITY, REGARDLESS OF THE FORM OF ACTION AND DAMAGES SUFFERED BY YOU, EXCEED THE COMMISSIONS AND FEES PAID BY YOU TO US IN THE MONTH IN WHICH THE ACTION AROSE.

**47. Risks of Online Trading.** Addendum 5 to this Agreement is a "Disclosure of Online Trading Risks." This Addendum generally describes the unique risks of online trading and volatile markets. You acknowledge that you have received and read Addendum 5.

**48. Use of Scottrade's Web Sites.** Web sites refer to Scottrade's Web sites (*scottrade.com, scottsave.com, scottrader.com* and additional Web sites that we may register). The Web sites provide you with content and information. Content includes account positions, account activity, balances, transaction status, statements, confirmations and other Account-related data. Information is not related specifically to an Account. Information is financial or investment information provided by third parties to us that we provide to you, which includes market data, news, research, financial analysis, commentary, or tools. The information on the Web sites is provided from sources believed to be reliable but cannot be guaranteed. The content on the Web sites is provided as a convenience but cannot be guaranteed.

The content on the Web sites is provided as a convenience but may be inaccurate or outdated. You agree at all times to rely upon your transaction confirmations and statements as the official records of your Account. We may without notice to you change, revise, modify, add, upgrade, remove or discontinue any part of the Web sites. The Web sites may include hyperlinks to third-party Web sites. We are not responsible for the information or content provided by such third-party Web sites. The information provided on our Web sites is not customized for you and you understand that the information provided to you is not a recommendation to you about the suitability of a purchase and/or sale of any security.

**49. Market Data, News and Other Information.** You agree that the market data, news and other information available to you through our Web site is for your personal use and that you will not retransmit or republish this information in any form. We may terminate your access to the above at any time in our sole and absolute discretion without notice to you. You acknowledge that the information provided to you is obtained from sources believed to be reliable and is presented on a best efforts basis, and that no accuracy or completeness of the information is guaranteed. You also acknowledge that we do not guarantee that there will not be interruptions in its availability. You further acknowledge that the provision of such information does not constitute a recommendation by us to purchase or sell any security or any financial, tax or legal advice by us. More specifically, with regard to market data, you agree that: a) "Data Disseminators" (the New York Stock Exchange, NASDAQ, the Options Price Reporting Authority, their processors and each constituents of these Data Disseminators, including the Chicago Board Options Exchange, NYSE Amex, National Stock Exchange, BATS Exchange, Inc., NYSE Arca, Philadelphia Stock Exchange, etc.) that make "Market Data" (e.g., last sale prices, bids, offers or any other information provided) available, own the proprietary rights to all market data they supply; b) neither we nor any Data Disseminator guarantees the timeliness, sequence, accuracy or completeness of any Market Data; c) the Data Disseminators and/or Scottrade shall not be liable to you or to any other person for any losses or damages arising from inaccuracies, errors omissions, delays, interruptions or non-performance, whether or not due to any negligent act or omission of any Data Disseminator or Scottrade. In no event shall any Data Disseminator or Scottrade be liable for any incidental, special, indirect or consequential damages, including but not limited to lost profits, trading losses or damages resulting from inconveniences or loss of use of Market Data services; d) no Data Disseminator nor Scottrade may be held liable for any discontinuance in the provision of Market Data or for any change in the manner of distribution for any reason; e) Market Data is made available for your own personal use and you are prohibited from furnishing it to any other person or entity; f) Data Disseminators or Scottrade may terminate your receipt of Market Data at any time; g) this Agreement is for the express benefit of Scottrade and the Data Disseminators and, accordingly, the Data Disseminators as third party beneficiaries hereof are entitled to enforce this agreement by legal proceeding or otherwise against you or any person that gains access to or uses Market Data other than as this Agreement contemplates. You shall pay the reasonable attorneys' fees that any Data Disseminator may incur in so enforcing this Agreement. Without limiting the generality of the foregoing, you agree that you will i) not use any software tools, procedures or instructions (other than to access the Web sites through standard browsers), automatic devices or automated processes, or manual processes to monitor or access data or content provided by us through the Web sites, ii) not use any device, hardware or software to bypass our security, iii) not disrupt or attempt to disrupt the proper or usual working of any Scottrade Web site or Market Data, news or information application, iv) not modify or alter any of our software, v) not use any software or process to access quantities or amounts of data that exceed Scottrade's limits including, without limitation, attempting to exceed or actually exceeding Scottrade's limitation on the number of stocks on which information may be simultaneously obtained (currently 20 stocks for the Scottrade brokerage service and 10 stocks for the Scottrader Service), vi) access the information available through our Web sites solely by manual request and not programmatically by macro or other automated means, and vii) not take any action that may cause, or that actually causes, an unreasonable or disproportionately large load on Scottrade's infrastructure or servers. You agree not to distribute any software or instructions that could be used to breach any of the terms and conditions set forth herein. You further agree that damages may not be an adequate remedy to Scottrade in the event of a breach of any provision of this paragraph by you and that such a breach would result in irreparable harm to Scottrade. Accordingly, in the event of any such breach or threatened breach, Scottrade shall have, in addition to any other remedies, the right to, as applicable, (a) specifically enforce such provision, and (b) restrain and enjoin breaches and threatened breaches by you.

**50. No Recommendation of Day Trading.** By providing the means to place trades electronically, we do not promote, recommend or endorse what is commonly referred to as day trading – the practice of purchasing and selling the same security within one day's trading. Day trading involves unique risks and you agree to educate yourself on the risk of day trading prior to engaging in this activity through our facilities.

**51. Extended Hours Trading Disclosure.** Addendum 6 to this Agreement is an "Extended Hours Trading Disclosure" statement. To the extent that you enter orders during after-market hours, you acknowledge you have carefully considered the risks of extended hours trading and whether such trading is appropriate for you. You acknowledge that you have received and read Addendum 6.

**52. License to Use Our Software.** With regard to ScottradeELITE users and other systems in which we have provided software for you to download, we grant you and you accept a non-exclusive and non-transferable license to use our proprietary software to communicate with our system ("Our Software"), solely as provided herein. Title to Our Software shall remain the sole property of Scottrade, including without limitation, all applicable rights to patents, copyrights and trademarks. You shall secure and protect Our Software in a manner consistent with the maintenance of Scottrade's ownership and rights therein and shall not sell, exchange, or otherwise transfer Our Software to others. We shall be entitled to obtain immediate injunctive relief against threatened breaches of the foregoing undertakings. You shall not copy, modify, translate, decompile, reverse engineer, disassemble or otherwise reduce to a human readable form, or adapt Our Software or use it to create a derivative work, unless authorized in writing to do so by the General Counsel of Scottrade. Any updates, replacements, revisions, enhancements, additions or conversions to Our Software supplied to you by us shall become subject to this Agreement. You agree that we shall have no liability for and you will hold us harmless from your use of Our Software.

## MARGIN ACCOUNTS

In consideration of Scottrade opening one or more Margin accounts for you, you agree to the foregoing and following provisions.

**53. Margin Loans.** We may, in our sole and absolute discretion, make loans to you for the purpose of purchasing, carrying or trading in securities, options or other property ("Margin Loans"). Margin Loans will be made in a Margin Account. You agree that you are solely responsible for determining whether margin is appropriate for you in light of your financial resources, objectives, and other relevant circumstances. You understand and agree that Scottrade will not make this determination on your behalf. Subject to regulatory requirements, the minimum and maximum amount of any particular Margin Loan may be established by us in our discretion regardless of the amount of Collateral delivered to us and we may change such minimum and maximum amounts from time to time.

**54. Risk of Margin Trading.** You understand that trading on margin (including effecting short sales) involves a high degree of risk and may result in a loss of funds greater than the amount you have deposited in your Account. Addendum 7 is a "Margin Disclosure Statement" regarding the risks of margin. You acknowledge that you have received, read, and understand Addendum 7.

**55. Requirement to Maintain Sufficient Margin.** Your margin transactions are subject, at all times, to the initial margin and maintenance margin requirements (the Margin Requirements") established by us and the applicable exchange, FINRA or the Federal Reserve Board. You shall monitor your Account to ensure that at all times the Account shall contain a sufficient account balance to meet the applicable Margin Requirements. We may modify such Margin Requirements for open and new positions, at any time, in our sole and absolute discretion. The margin that we require may exceed the margin required by any exchange or association. We may reject any order if you do not have a sufficient account balance to meet Margin Requirements and may delay the processing of any order while determining the correct margin status of your Account. You shall maintain, without notice or demand from us, a sufficient account balance at all times so as to continuously meet the Margin Requirements. The general formulas for calculating margin requirements provided in the paragraph below are only illustrative and may not accurately reflect the actual margin requirement in effect at a particular time for your Account. You agree to promptly satisfy all margin and maintenance calls. You acknowledge that we are not obligated to: (a) request additional securities or other property for margin purposes in the event the Account falls below minimum margin requirements; (b) notify you of any such deficiency; or (c) allow you time to deposit additional securities or other property. You agree to promptly satisfy all margin and maintenance calls. With regard to initial margin, Regulation T of the Federal Reserve Board and NASD Rule 2520 require that all margin accounts meet a $2,000 minimum equity requirement ($25,000 is required if you are deemed to be a "pattern day trader" pursuant to NASD Rule 2520); and have available cash equal to at least 50 percent of the amount purchased. With regard to maintenance requirements, we typically issue a margin call (i.e. request for the immediate deposit of additional Collateral) if the equity in your Account drops below 35 percent (50 percent for non-U.S. residents who have an International Account) of the market value after the close of the regular trading session. In some situations such as (but not limited to) concentrated positions, low priced stocks or volatile stocks, we may require substantially greater collateral than normal initial or maintenance levels. We reserve the right to calculate the foregoing on an intra-day basis.

**56. Margin Calls.** Margin calls may be issued in writing, via telephone, electronically, or by other means of communication. In some situations, such as volatile market conditions, we may not immediately issue a margin call when your Account equity falls below 35 percent. You are responsible for acting immediately on any maintenance calls, buy in or sell out notices given orally or in writing. Your failure to promptly deposit additional money or securities in response to a margin call, regardless of the equity level in your Account, may result in the liquidation of part or all of the securities in your Account. Although we will generally attempt to notify you of a margin call and give you an opportunity to deposit additional equity to secure the Account, we reserve the right to institute immediate discretionary liquidation of any and all securities without prior notice and without giving you the opportunity to deposit additional equity. This sole and absolute discretion applies regardless of any historical pattern of delivering verbal/written notices or of any current verbal or written representations by Scottrade that indicates a different dollar amount, liquidation time, or suggests additional time based on due date. This sole and absolute discretion to liquidate immediately applies regardless of time zone differentials, language interpretations, or delays in wiring funds, and includes the sole and absolute discretion to choose which positions to liquidate and in what order. It is your responsibility to monitor and liquidate positions to minimize your losses before we are forced to liquidate on your behalf to protect our interest as a creditor. We reserve the right at our sole and absolute discretion to close out any positions for any Account that represents a negative liquidation value.

**57. Interest Charges on Debit Balances.** You agree to pay interest on all debit balances in any Account. Interest on your average daily net debit balance will be calculated using a base rate determined by us and may be changed at any time in our discretion. The base rate is influenced by market conditions, loan demand, broker call rate and/or prime rate. Additional discounts may apply. Interest is accrued daily and will be posted or compounded monthly and is calculated on a 360-day year. You understand that the use of a 360-day year results in higher interest payments than if a 365-day year were used. We reserve the right to change the rate at anytime and without advance notice. Free credit balances in your Account will be used to reduce your margin debit balance before interest is calculated. You understand that the interest charge made to your Account(s) at the close of a charge period will be added to the opening balance for the next charge period unless paid.

| Debit Balance | Margin Interest Rate |
|---|---|
| $0.00 - $9,999.99 | 0.25% below base rate |
| $10,000.00 - $24,999.99 | 0.50% below the base rate |
| $25,000.00 - $49,999.99 | 0.75% below the base rate |
| $50,000.00 - $99,999.99 | 1.25% below the base rate |
| $100,000.00 - $249,999.99 | 1.5 % below the base rate |
| $250,000.00 - $499,999.99 | 1.75% below the base rate |
| $500,000.00 - $999,999.99 | 2.25% below the base rate |
| $1,000,000.00 and above | 2.75% below the base rate |

**58. Short Sales.** You agree to advise us prior to entering a sell order if it is a "short" sale (the sale of a security that you do not own). You agree that all short sale transactions shall be executed in a Margin Account. You understand that to facilitate a short sale, we must borrow the securities that you sell short. Short sales can be subject to a buy in from settlement date and thereafter. Scottrade does not guarantee a minimum time to short a position. Should Scottrade be unable to borrow or re-borrow a security you have sold short, or for any other reason we deem prudent, we may at our discretion, with or without notice, cover your position by buying the stock at the current market price and you agree to be liable to Scottrade for any resulting debit balance. Margin Accounts are marked to the market daily and any increase in value of a short position will result in that unrealized loss being added to your debit balance and interest being charged as described above. Similarly, a drop in value will decrease your debit balance. If the lender should call in your borrowed securities for any reason such as a tender offer, and you cannot cover in time to make delivery, we may hold you responsible for any resulting loss. You agree that if (a) market conditions change, (b) we are unable to borrow the securities, (c) the lender recalls the securities, or (d) the provisions of NASD Rule 11830 (Mandatory Closeout for Short Sales) become applicable, we may attempt to reborrow the securities, but you understand that we may need to cover the short position in the Account on the open market at the then-current market price and market conditions. You understand that you will be responsible for any resulting loss or associated costs incurred by us in connection with "short" transactions. The initial margin requirement is 50 percent of the short sale amount and the minimum maintenance level will be 140 percent of the market value of the short position on securities priced above $12.50 per share. On securities priced between $5 and $12.50, the maintenance requirement is $5 per share. Securities under $5 may not be sold short. Short sale proceeds help secure our loan to you and may not be withdrawn. You are liable for any dividends paid on securities you have sold short.

**59. Loan of Securities.** We are authorized to lend ourselves, as principal or otherwise, or others any securities held by us in your Account and we shall have no obligation to retain under our possession and control a like amount of such securities. In connection with such loans, we may receive and retain certain benefits (including interest on collateral posted for such loans) to which you shall not be entitled. In certain circumstances, such loans may limit, in whole or in part, your ability to exercise voting rights of the securities lent.

**60. Pledge of Securities, Options and Other Property.** All securities and other property now or hereafter held, carried or maintained by us in or for your Account may, from time to time without notice to you, be pledged, repledged, hypothecated or re-hypothecated by us, either separately or in common with other securities and other property. The values received may be greater than the amount you owe us. Any losses, gains or compensation resulting from these activities will not accrue to your brokerage Account. We are required under SEC rule 15c3-3 to retain in our possession and control all fully paid-for securities. Securities used as Collateral for Margin Loans are not fully paid for and therefore are not subject to the same obligation.

> **Addendum 1**
> **Customer Identification Program Notice**

The following is Important Information You Need to Know About Opening A New Account.

To help the government fight the funding of terrorism and money laundering activities, Scottrade is required to obtain, verify, and record information that identifies each person who opens an account with us. This Notice answers some questions that you may have about Scottrade's Customer Identification Program.

When you open an account, Scottrade is required to collect information such as the following from you: 1) your name; 2) date of birth; 3) permanent address; and 4) identification number. Typically, if you are a U.S. Citizen, the identification number required is your social security number. You may also need to show your driver's license or other identifying documents.

> **Addendum 2**
> **Privacy Policy and Security Statement**

The Scottrade Privacy Statement describes how we collect and protect your personal information in the course of providing you with financial services.

**Our Privacy Policy.** We are very committed to protecting the privacy of your personal information. Scottrade wants you to know that:
· We do not sell, rent or license your personal information to anyone.
· We maintain physical, electronic and procedural safeguards that restrict unauthorized access to your personal information.
· We train our employees about privacy and limit access to this information.

**Personal Information We May Collect.** We collect personal information about you, which may include your name, physical address, e-mail address, telephone number, Social Security number and other information as required.

SF1111/FC/9-09

Case 4:20-cv-00166-SRB   Document 1-1   Filed 03/04/20   Page 25 of 35

We obtain this information from the following sources:
- Information you provide online, on written applications or forms, and other information you may provide;
- Information entered online that may be stored even if you do not complete or submit an application;
- Information from third parties in order to verify your identity or to prevent fraud;
- Information from third parties that you authorize to provide information to us; and
- Information about your transactions, account experience, account balance, trading activity and payment history.

**Personal Information We Use or Disclose.** Scottrade does not sell, rent or license your personal information to anyone. This applies to both current and former customers. We use your personal information to provide services you may have requested, to respond to communications from you, and to help you open new or additional accounts. We disclose your personal information, as permitted by law, to non-affiliated third parties that help us provide financial services to you. This includes third parties who provide statements of your accounts, transaction confirmations and check printing; or provide custody, depository or recordkeeping services. All non-affiliated third parties that accept or receive personal information from us are obligated contractually or by law or regulation to keep this information confidential and to use the information only to provide the services we ask them to perform.

We disclose personal information to government and regulatory agencies and to comply with a lawful summons, court order, subpoena, fraud investigation, audit or regulatory examination.

**Security of Your Personal Information.** We maintain physical, electronic and procedural safeguards that restrict access to your personal information. We comply with applicable laws and regulations.

Our online environment uses industry leading security technologies including layered security and access controls over personal information.

These safeguards are reviewed and may be adjusted in response to advances in technology and the latest security threats.

**How We Use Cookies.** Scottrade uses first-party and third-party cookies. Cookies are small text files sent by a Web site server to your Web browser and stored on your computer. The use of cookies helps us understand how you are using our Web site. They allow us to improve the security, content, navigation and functionality of the Web site. Additionally, we use cookies on our Web sites and the sites on which we advertise to track advertising performance and to collect aggregate data on Web page viewing. Cookies are not used to collect or disseminate any personal information.

You can manage the placement of cookies on your computer through the features found in most Internet browsers. You can also delete cookies that have already been placed on your computer. Consult the "Help" function of your browser to explore your options.

**Internet Protocol (IP) Address.** As you enter our Web site, we capture and retain the IP address of the device you are using, such as a personal computer or a handheld device. The IP address does not identify you or your personal information and is used for security purposes only.

**Links to Other Web Sites.** We provide links to other third-party Web sites to provide information that may be of interest to you. When you select a link to a third-party site, you are subject to the privacy and security policies of the third party.

**How to Protect Yourself.** We encourage you to protect your personal computers by using the Security Checklist on the Scottrade.com Web site under the Security Section and ensure your account information is stored securely, transactions are accurately reflected and contact information is up-to-date.

**Steps to Take if You Become an Identity Theft Victim.** If you feel you have become the victim of online identity theft, you should take the following steps:
- If you feel your Scottrade account has been compromised in any way, immediately contact us toll-free at 1-800-619-SAVE (7283).
- Contact the fraud department at each major credit bureau and tell them you are an identity theft victim:
    1. Equifax - call 800.525.6285 or visit www.equifax.com
    2. Experian - call 888.397.3742 or visit www.experian.com
    3. TransUnion - call 800.680.7289 or visit www.transunion.com
- Contact the creditors/companies for any accounts that have been tampered with or opened fraudulently. Speak with someone in the security or fraud area of each creditor/company; follow up with a letter.
- File a report with your local police or the police in the community where the online fraud took place. Get a copy of the police report in case you need proof of the crime.
- Keep records of everything involved in your efforts to clear up the fraud including copies of written correspondence and records of telephone calls.
- File a complaint with the Federal Trade Commission (FTC).

**Revisions.** Scottrade reserves the right to make changes to the Privacy Statement at any time. Any changes or updates become effective immediately upon posting to this site. Please check the "Last Revision" date below to determine if there have been any changes since you have last reviewed our Privacy Statement. Scottrade provides an annual privacy notice to current customers. You may always review our Privacy Statement online at www.scottrade.com, or contact us for a copy at 1-800-619-SAVE (7283).

Last Revision 12/2/2008

| Addendum 3 |
| --- |
| **Mutual Fund Breakpoint Discounts Disclosure Statement** |

Before investing in mutual funds, it is important that you understand the sales charges, expenses, and management fees that you will be charged, as well as the breakpoint discounts to which you may be entitled. Understanding these charges and breakpoint discounts will assist you in identifying the best investment for your particular needs and may help you reduce the cost of your investment. This disclosure document will give you general background information about these charges and discounts. However, sales charges, expenses, management fees, and breakpoint discounts vary from mutual fund to mutual fund. Therefore, you should review each mutual fund's prospectus and statement of additional information, which are available from Scottrade or the fund, to get the specific information regarding the charges and breakpoint discounts associated with a particular mutual fund.

**Sales Charges.** Investors that purchase mutual funds must make certain choices, including which funds to purchase and which class share is most advantageous. Each mutual fund has a specified investment strategy. You need to consider whether the mutual fund's investment strategy is compatible with your investment objectives. Additionally, most mutual funds offer different share classes. Although each share class represents a similar interest in the mutual fund's portfolio, the mutual fund will charge you different fees and expenses depending upon your choice of share class. As a general rule, Class A shares carry a "front-end" sales charge or "load" that is deducted from your investment at the time you buy fund shares. This sales charge is a percentage of your total purchase. As explained below, many mutual funds offer volume discounts to the front-end sales charge assessed on Class A shares at certain pre-determined levels of investment, which are called "breakpoint discounts." In contrast, Class B and C shares usually do not carry any front-end sales charges. Instead, investors that purchase Class B or C shares pay asset-based sales charges, which may be higher than the charges associated with Class A shares. Investors that purchase Class B and C shares may also be required to pay a sales charge known as a contingent deferred sales charge when they sell their shares, depending upon the rules of the particular mutual fund.

**Breakpoint Discounts.** Most mutual funds offer investors a variety of ways to qualify for breakpoint discounts on the sales charge associated with the purchase of Class A shares. In general, most mutual funds provide breakpoint discounts to investors who make large purchases at one time. The extent of the discount depends upon the size of the purchase. Generally, as the amount of the purchase increases, the percentage used to determine the sales load decreases. In fact, the entire sales charge may be waived for investors that make very large purchases of Class A shares. Mutual fund prospectuses contain tables that illustrate the available breakpoint discounts and the investment levels at which breakpoint discounts apply. Additionally, most mutual funds allow investors to

qualify for breakpoint discounts based upon current holdings from prior purchases through "Rights of Accumulation," and future purchases, based upon "Letters of Intent." This document provides general information regarding Rights of Accumulation and Letters of Intent. However, mutual funds have different rules regarding the availability of Rights of Accumulation and Letters of Intent. Therefore, you should review the mutual fund prospectus to determine the specific terms upon which a mutual fund offers Rights of Accumulation or Letters of Intent.

*1. Rights of Accumulation* – Many mutual funds allow investors to count the value of previous purchases of the same fund, or another fund within the same fund family, with the value of the current purchase, to qualify for breakpoint discounts. Moreover, mutual funds allow investors to count existing holdings in multiple accounts, such as IRAs or accounts at other broker-dealers, to qualify for breakpoint discounts. Therefore, if you have accounts at other broker-dealers and wish to take advantage of the balances in these accounts to qualify for a breakpoint discount, you must advise Scottrade about those balances. You may need to provide documentation establishing the holdings in those other accounts to Scottrade if you wish to rely upon balances in accounts at another firm. In addition, many mutual funds allow investors to count the value of holdings in accounts of certain related parties, such as spouses or children, to qualify for breakpoint discounts. Each mutual fund has different rules that govern when relatives may rely upon each other's holdings to qualify for breakpoint discounts. You should review the mutual fund's prospectus or statement of additional information to determine what these rules are for the fund family in which you are investing. If you wish to rely upon the holdings of related parties to qualify for a breakpoint discount, you should advise Scottrade about these accounts. You may need to provide documentation to Scottrade if you wish to rely upon balances in accounts at another firm.

**Mutual funds also follow different rules to determine the value of existing holdings. Some funds use the current net asset value (NAV) of existing investments in determining whether an investor qualifies for a breakpoint discount. However, a small number of funds use the historical cost, which is the cost of the initial purchase, to determine eligibility for breakpoint discounts. If the mutual fund uses historical costs, you may need to provide account records, such as confirmation statements or monthly statements, to qualify for a breakpoint discount based upon previous purchases. You should review the mutual fund's prospectus to determine whether the mutual fund uses either NAV or historical costs to determine breakpoint eligibility.**

*2. Letters of Intent* – Most mutual funds allow investors to qualify for breakpoint discounts by signing a Letter of Intent, which commits the investor to purchasing a specified amount of Class A shares within a defined period of time, usually 13 months. For example, if an investor plans to purchase $50,000 worth of Class A shares over a period of 13 months, but each individual purchase would not qualify for a breakpoint discount, the investor could sign a Letter of Intent at the time of the first purchase and receive the breakpoint discount associated with $50,000 investments on the first and all subsequent purchases. Additionally, some funds offer retroactive Letters of Intent that allow investors to rely upon purchases in the recent past to qualify for a breakpoint discount. However, if an investor fails to invest the amount required by the Letter of Intent, the fund is entitled to retroactively deduct the correct sales charges based upon the amount that the investor actually invested. If you intend to make several purchases within a 13 month period, you should review the mutual fund prospectus to determine if it would be beneficial for you to sign a Letter of Intent. You can see, understanding the availability of breakpoint discounts is important because it may allow you to purchase Class A shares at a lower price. The availability of breakpoint discounts may save you money and may also affect your decision regarding the appropriate share class in which to invest. Therefore, you should carefully review the mutual fund prospectus and its statement of additional information, when choosing among the share classes offered by a mutual fund.

If you wish to learn more about mutual fund share classes or mutual fund breakpoints, you can review the investor alerts available on the FINRA Web site at *www.finra.org* (Investor Information > Investor Alerts > Mutual Funds) or visit the many mutual fund Web sites available to the public.

---
**Addendum 4**
**Business Continuity Disclosure**
---

In accordance with regulations, Scottrade has developed a business continuity plan that is intended to permit us to continue critical business operations during natural disasters, power outages or other significant events.

While there can be no assurance that service will continue without interruption in all circumstances, our plan does address the actions that we will take in the event that there is a significant disruption. Account access is planned to be restored as the first step, which would be followed by other critical business operations.

We maintain a back-up facility, including a secondary data center for all of our branches nationwide. Our back-up facility is located well away from our primary facility so that it would not be affected by a regional disruption. Account access would be available through the data center at our back-up facility and your local branch office. Our plan will be reviewed, updated and tested periodically.

---
**Addendum 5**
**Risks of Online Trading**
---

There are certain risks associated with online investing. You need to be aware of these risks so that you can take steps to minimize those risks. Scottrade provides you guidelines for getting started and provides you many detailed references to government and other regulatory Web sites for additional resources for evaluating online trading risks.

**Enter Orders Wisely.** There is no substitute for wise planning when deciding to enter an order online. Understand the companies that you are buying and selling, and know what your goals are for each investment. Most of all, understand your own risk tolerance and the risks involved with each of your investments.

**Stock Quotes.** Before you place an order for a stock, it is a good idea to look at the stock's quote. Check the ask price (the price at which the security is offered for sale in the market) if your order is a buy. If your order is a sell, you should check the bid price (the price a buyer is willing to pay). Doing so will provide you with an indication of the price that you will pay or receive for the security. The volume of a stock, often provided along with the price quote, will tell you the number of shares traded from the current day's market opening until the reported trade time. Scottrade provides you real time quotations through our Web site. It is important to realize that a real-time quote is not a guarantee that your order will be executed at that price. There may be a delay in the real time quote, the market may be moving quickly, your order may be behind another order in priority or other reasons that may delay an order's execution.

**Fast Markets.** In quickly changing markets, or fast markets as they are called, the bid and ask prices change rapidly. For example, securities of companies that have recently made initial public offerings (IPOs) may be particularly prone to price volatility. If there is a large volume of shares being traded in that stock, there may be a delay in the execution of your order. From the time you obtain a real-time quote and place your market order, to the time the order is actually executed, the price may change substantially. If you get a real-time quote that says a stock is selling at $100, and the price moves up to $110 by the time your order is filled, you will pay $110. This may cause you to overspend the balance in your account. You should be especially cautious if you place orders, especially market orders, during fast markets.

**Order Queues.** Although we automatically route most orders up to a certain size or type that we receive to a market center, there may be times when we suspend automatic routing. This may be due to a change in size or other order parameters, fast markets, order queues or other market or operational reasons.

**Limit Orders.** When you place a market order (except in the last few minutes of the trading day), you are likely to receive an execution. But as described earlier, you are not guaranteed a specific execution price. In order to handle pricing uncertainties, you may want to place what is known as a limit order. A limit order lets you specify the price at which you are willing to have the order executed. If you are placing an order to buy a stock, you can set a limit that says you are only willing to buy at or below a specified price. The advantage of a limit order is that you will be protected from having to pay more than your limit price for the stock. The downside is that if the market moves higher, your order will not be executed, and you will not own the stock you *wished to purchase*.

Although limit orders guarantee a particular price, they do not guarantee that your order will be executed. A market order, on the other hand, essentially ensures that your order will be executed but does not guarantee a particular price. Depending upon your preferences, limit orders may or may not be an appropriate tool. Additionally, you should always consider whether buying highly volatile stocks are appropriate for your investment strategy.

**Order Status.** Be aware that submitting a trade online is not the same as having that trade executed. When you submit an order, you will receive a reference order number signifying that we have received your order. In most situations, the order is automatically transmitted to the market. In some instances, the order may need to be reviewed and approved before it is sent to a market center. Before you place an order for a number of reasons, for example, because you are trying to sell short a hard-to-borrow security that is not approved by our stock loan department. In most situations, you will receive notice that your order was executed or that you have a current open order. In some situations, market centers may be slow in returning execution reports to Scottrade so you should not assume that the order did not go through.

**Cancellations.** Similarly, if you cancel an order, make sure the cancellation worked before placing another trade. Orders can only be canceled if they have not been executed. Although Scottrade may submit your cancellation request to the market center, this does not mean it was canceled. To see whether your cancellation did occur for stocks, the cancellation request will show as pending until we receive acknowledgment from the market center that the cancel has been accepted.

**System Availability.** On occasion, you may not be able to access our Web site. Although we have many information technology professionals working to keep our systems running, any computer system, whether it is yours, your Internet Service Provider's, or ours, can experience unscheduled outages or slowdowns for a variety of reasons. Computer problems can arise on your end, our end, or anywhere in between. Your computer may break down. The telephone line between your computer and your Internet service provider may be slow or fail. Your Internet service provider may go down. Our computers and the computers we link to may have problems. Additionally, even if all systems are working, when trading volumes soar and many investors want to buy or sell at the same time, lines form and orders cannot be filled as quickly as you would like. Scottrade has taken precautions to help our systems handle heavy use in fast markets, but neither we nor any other online brokerage can promise complete reliability under all circumstances. If you experience problems, you can always place an order by calling your local Scottrade branch or using telephone order entry system.

**Additional Information.** Although the above highlights many of the unique risks of online order entry, the SEC and FINRA have additional information available at the Web sites listed below:

Investing and the Internet: *www.finra.org/InvestorInformation/InvestmentChoices/InvestorBrochureSeries/p011860*

Online Trading FAQ: *www.finra.org/InvestorInformation/InvestmentChoices/OnlineTrading/p005931*

Investing Online Resource Center: *www.investingonline.org*

Guidance To Investors Regarding Stock Volatility and Online Trading: *www.finra.org/InvestorInformation/InvestmentChoices/OnlineTrading/p005932*

Online Trading in Fast-Moving Markets: *www.sec.gov/investor/pubs/onlinetips.htm*

Purchasing on Margin, Risks Involved with Trading in a Margin Account: *www.finra.org/InvestorInformation/InvestmentChoices/MarginInformation/p005927*

Understanding Margin Accounts, Why Brokers Do What They Do: *www.finra.org/InvestorInformation/InvestmentChoices/MarginInformation/p005922*

---

**Addendum 6**
**Extended Hours Trading**

---

**Extended Hours Risk Disclosure.** There are increased risks with extended hours trading. Below is an explanation of those risks. If you are not comfortable assuming these risks you should not enter orders on our extended hours trading site.

**Definition.** Extended hours trading is a means of trading before or after the regular trading session in certain Nasdaq and Listed securities through Electronic Communications Networks (ECNs). Options are not available for extended hours trading. ECNs match buy and sell orders at specified (Limit Order) prices. If you want to buy a stock through an ECN, but there are no sell orders to match the buy order, the order will not be executed until a matching sell order is received, and vice versa.

Extended hours trades are not held to Time and Sales

**Hours.** Pre-Market trading is from 8:00 am - 9:15am ET on selected NASDAQ and Listed securities, Monday through Friday on days when the market is open. After-Hours trading is from 4:15pm to 8:00pm ET on selected NASDAQ and Listed securities, Monday through Friday on days when the market is open. On any day, extended hours (Pre-Market and/or After-Hours) trading may be unavailable, delayed, interrupted, or terminated early without any prior notice. When the regular trading session closes at 1:00pm ET, After-Hours trading will generally be offered from 1:15pm to 5pm ET.

**Limit Orders.** You may only enter day limit orders for Pre-Market and After-Hours hours trading. If your order is not executed, it will expire at the end of the relative trading session each day (Either the Pre-Market or After-Hours). Orders will not roll over or carry over to the next trading session. Extended hours orders may be modified and cancelled; however, these orders are subject to prior execution. You will be responsible for any execution at your original price. You will not be able to change an order from regular trading hours to extended hours trading. Pre-Market and After-Hours trading are separate trading sessions and orders are not linked between the two sessions. Order qualifiers may not be used in the extended hours trading session. All executed orders will be processed as a trade for that day subject to three-business day settlement.

**Risk of Lower Liquidity.** Liquidity refers to the ability of market participants to buy and sell securities. Generally, the more orders available in a market, the greater the liquidity. Liquidity is important because with greater liquidity it is easier for investors to buy or sell securities, and as a result, investors are more likely to pay or receive a competitive price for securities purchased or sold. There may be lower liquidity in extended hours trading as compared to regular market hours. As a result, your order may only be partially executed, or not at all.

**Risk of Higher Volatility.** Volatility refers to the changes in price that securities undergo when trading. Generally, the higher the volatility of a security, the greater its price swings. There may be greater volatility in extended hours trading than in regular market hours. As a result, your order may only be partially executed, or not at all, or you may receive an inferior price in extended hours trading than you would during regular market hours.

**Risk of Changing Prices.** The prices of securities traded in extended hours trading may not reflect either the price at the end of regular market hours, or the opening price the next morning. As a result, you may receive an inferior price in extended hours trading than you would during regular market hours.

**Risk of Wider Spreads.** The spread refers to the difference in price between what you can buy a security for and what you can sell it for. Lower liquidity and higher volatility in extended hours trading may result in wider than normal spreads for a particular security.

**Risk of Unlinked Markets.** Depending on the extended hours trading system or the time of the day, the prices displayed on a particular extended hours trading system may not reflect the prices in other concurrently operating extended hours trading systems dealing in the same securities. Accordingly, you may receive an inferior price in one extended hours trading system than you would in another extended hours trading system.

**Risk of News Announcements.** Normally, issuers make news announcements that may affect the price of their securities after regular market hours. Similarly, important financial information is frequently announced outside of regular market hour. In extended hours trading, these announcements may occur during trading, and if combined with lower liquidity and higher volatility, may cause an exaggerated and unsustainable effect on the price of the security.

**Risk of Lack of Calculation or Dissemination of Underlying Index Value or Intraday Indicative Value ("IIV").** For certain Derivative Securities Products, an updated underlying index value or IIV may not be calculated or publicly disseminated in extended trading hours. Since the underlying index value and IIV are not calculated or widely disseminated during the pre-market and post-market sessions an investor who is unable to calculate implied values for certain Derivative Securities Products in those sessions may be at a disadvantage to market professionals.

Addendum 7
**Margin Disclosure Statement**

Scottrade is furnishing you this document to provide some basic facts about purchasing securities on margin, and to alert you to the risks involved with trading securities in a margin account.

Before trading stocks in a margin account, you should carefully review the margin agreement sections of the Scottrade Brokerage Account Agreement and the margin information on Scottrade's Message Center. Please contact your Scottrade branch office regarding any questions or concerns you may have with your margin account.

When you purchase securities, you may pay for the securities in full or you may borrow part of the purchase price from Scottrade. If you choose to borrow funds, it will be done in a margin account. The securities held in your margin account are Scottrade's collateral for the loan to you. If the securities in your account decline in value, so does the value of the collateral supporting your loan and, as a result, Scottrade can take action, such as issue a margin call and/or sell securities or other assets if any of your accounts, in order to maintain the required equity in the account.

It is important that you fully understand the risks involved in trading securities on margin. These risks include, but are not limited to, the following:

· **You can lose more funds than you deposit in the margin account.** A decline in the value of securities that are purchased on margin may require you to provide additional funds to Scottrade to avoid the forced sale of those securities or other securities in your account.
· **Scottrade can force the sale of securities or other assets in your account(s).** If the equity in your account falls below the maintenance margin requirements or Scottrade's higher "house" requirements, Scottrade can sell the securities or other assets in any of your accounts held at Scottrade to cover the margin deficiency. You also will be responsible for any short fall in the account after such a sale.
· **Scottrade can sell your securities or other assets without contacting you.** Some investors mistakenly believe that a firm must contact them for a margin call to be valid, and that the firm cannot liquidate securities or other assets in their accounts to meet the call unless the firm has contacted them first. This is not the case. Although Scottrade will most often attempt to notify customers of margin calls, it is not required to do so. However, even if Scottrade has contacted a customer and provided a specific date by which the customer can meet a margin call, Scottrade can still take necessary steps to protect its financial interests, including immediately selling the securities without notice to the customer.
· **You are not entitled to choose which securities in your margin account are liquidated or sold to meet your margin call.** Because the securities are collateral for your margin loan, Scottrade has the right to decide which security to sell in order to protect its interests.
· Scottrade may increase its "house" maintenance margin requirements at any time and is not required to provide you with advance written notice. These changes in policy can take effect immediately and may result in the issuance of a maintenance margin call. Your failure to satisfy this call may cause a forced liquidation of your account.
· **You are not entitled to an extension of time on a margin call.** While an extension of time to meet margin requirements may be available under certain conditions, you do not have a right to the extension. Scottrade has the sole and absolute discretion to provide an extension.

Addendum 8
**Bank Deposit Program Terms, Conditions, and Important Disclosures**

The Scottrade Bank Deposit Program ("BDP" or Bank Deposit Program "BDP") seeks to provide you with the security of FDIC insurance for your cash balances. By utilizing multiple banks, the BDP has been structured to provide you with up to $2,500,000 in FDIC insured deposits subject to the limitations set forth herein. Through the BDP, excess cash balances in your eligible Scottrade brokerage account will automatically be deposited into interest-bearing FDIC-insured deposit accounts ("BDP Account") at one or more banks ("Program Banks"). Your fund balance in each BDP Account, individually and aggregated, is referred to as your "Customer Deposit Account." One of the Program Banks in the BDP will be Scottrade Bank FSB ("Scottrade Bank"), an affiliate of Scottrade, Inc. ("Scottrade").

**1. Authority as Agent.** Scottrade will act as your agent in establishing and maintaining the BDP Account at each Program Bank. Each BDP Account is established on an omnibus basis at each Program Bank, with records of ownership maintained by Scottrade and the Program Banks in a manner consistent with FDIC rules governing "pass through" deposit insurance. You understand that you have the right to withdraw your consent to have Scottrade act as your agent on your Customer Deposit Accounts on a Program Bank by Program Bank basis. You may choose not to participate in the BDP or may block any Program Bank from receiving your funds. You may make either of these elections online or by completing a form that may be obtained from your local Scottrade branch office. If you withdraw your consent, your cash will not be swept to BDP Accounts and, if applicable, cash in BDP Accounts will be transferred back to your Scottrade brokerage account.

**2. Eligibility.** To be eligible for the BDP, your Scottrade brokerage account must be of the following type: individual, joint, IRA, custodial, trust for which the beneficiaries are natural persons or sole proprietorship. Accounts in the name of business entities, including corporations and partnerships, are not eligible at this time. Scottrade, in its sole and absolute discretion, may further decide that your account is eligible or ineligible for the BDP if the cash available for sweeping in your Scottrade brokerage account does not reach or drops below a certain dollar level that Scottrade may set or because of Scottrade's operational or administrative requirements. You may also lose your eligibility by blocking one or more Program Banks from receiving your funds.

**3. Account Protection.** Deposits in BDP Accounts are insured by the FDIC subject to conditions set by the FDIC and in this agreement, an independent agency of the U.S. government. The FDIC protects you against the loss of your insured deposits in the event a Program Bank fails. The maximum amount of FDIC deposit insurance coverage under the BDP is $2,500,000 for each category of legal ownership until Dec. 31, 2013. After Dec. 31, 2013, the FDIC's standard coverage limits will return to $100,000 for all deposit categories except IRAs and certain retirement accounts and the maximum amount of FDIC deposit insurance coverage under the BDP will return to a maximum of $1,000,000 for each category of legal ownership. The FDIC insurance coverage limit applicable to each capacity of legal ownership is referred to herein as the "Maximum Applicable Deposit Insurance Amount." Your funds become eligible for FDIC deposit insurance when the funds are deposited in a Program Bank. If a Program Bank were to fail, the FDIC would cover the principal and accrued interest up to the Maximum Applicable Deposit Insurance Amount. Any other deposits that you maintain in the same category of legal ownership with the same Program Bank will be aggregated with your funds in BDP Accounts for purposes of the Maximum Applicable Deposit Insurance Amount. This includes investments such as certificates of deposit, other direct deposits you make with the Program Bank, and deposits through other BDP Accounts you have with Scottrade or through another brokerage firm. **You are responsible for monitoring all your balances to determine what deposit insurance coverage is available to you.** If you have questions about FDIC insurance coverage, more information about FDIC insurance is available at *www.fdic.gov* or by phone (877-275-3342 or 800-925-4618). Or, you may wish to seek advice from your own attorney or financial advisor concerning FDIC insurance coverage of deposits. The Securities Investor Protection Corporation ("SIPC") and Scottrade's excess SIPC insurance do not cover deposits in the BDP Accounts.

**4. Deposits.** Although the BDP Accounts are the obligations of the Program Banks and not Scottrade, you will not have a direct relationship with the Program Banks. Deposits cannot be placed directly with Program Banks through the BDP. Deposits to BDP Accounts will be made by Scottrade on your behalf. Information about the BDP Accounts and your Customer Deposit Accounts is available to you from Scottrade and not the Program Banks. Each business day Scottrade will deposit, or cause to be deposited, the excess cash balances in your Scottrade brokerage account in one or more omnibus deposit accounts maintained at the Program Banks, as described further below. The omnibus deposit accounts at the Program Banks are held in the name of *Scottrade for the exclusive benefit of its customers.* Your BDP Accounts will be reflected by a book entry on Scottrade's account records. No evidence of ownership, such as a passbook or certificate, will be issued to you, and no deposits or withdrawals will be accepted directly from you by the Program Banks. The ownership title and address of your Customer Deposit Account will be the same as your brokerage account. Your periodic Scottrade account statement will display all monthly BDP activity, as well as your end of month balance at each

Electronically Filed - Jackson - Independence - January 23, 2020 - 11:51 AM

Program Bank. Available cash in your Scottrade brokerage account will be deposited into a BDP Account at a Program Bank until the balance of your BDP Account reaches an amount, depending on the insurable capacity of the account, of just less than the Maximum Applicable Deposit Insurance Amount. Scottrade will then deposit additional funds at the next eligible Program Bank up to an amount, depending on the insurable capacity of the account, of just less than the Maximum Applicable Deposit Insurance Amount. Once your Customer Deposit Account deposits in the aggregate are at the program maximum set forth in paragraph 3 above, additional amounts will be deposited into Scottrade Bank or another Program Bank acting as an excess bank. An excess bank in the BDP is a bank that will accept funds without limitation and without regard to the Maximum Applicable Deposit Insurance Amount. You may not select which of the Program Banks receive such excess deposits of your funds. From time to time, Scottrade may add, replace or otherwise change one or more of the Program Banks. In most cases, we will post such changes in advance on our Web site so you will have an opportunity to block a Program Bank from receiving your funds. These changes are also available from your Scottrade branch office. Because you are responsible for monitoring the total amount of your funds (including your Customer Deposit Account funds) on deposit at each Program Bank in order to determine the extent of the FDIC insurance coverage available, you should carefully review such notice and determine if the change in Program Banks has an impact on your deposit insurance coverage.

**5. Withdrawals.** When funds are needed to cover transactions such as securities purchases, withdrawal requests, checks, etc. in your Scottrade brokerage account, we will, as a general matter, first use any free credit balances in your Scottrade brokerage account and then Scottrade, as your agent, will withdraw funds from the BDP Accounts maintained at one or more Program Banks where you have deposits. In general we will withdraw funds first from the last Program Bank in which funds have been deposited. If there are not sufficient funds on deposit at the last Program Bank in which funds were deposited, we will withdraw funds from the next Program Bank in which funds have been deposited. We will withdraw funds from BDP Accounts at Program Banks in descending order, except where circumstances require a different withdrawal method. Federal banking regulations require Banks to reserve the right to require seven days' prior notice before permitting transfers or withdrawals from BDP or other deposit accounts.

**6. Interest.** Funds in the BDP will generally earn interest. The rate of interest may vary over time, but will be the same from each Program Bank. The rate will be tiered based on the aggregate balance of your Customer Deposit Account. The interest rate for each tier is based on a number of factors, including general economic and business conditions. Interest will be paid by the Program Bank. Customers with higher balances will receive higher interest rates on their Customer Deposit Accounts than customers with lower Customer Deposit Account balances. Your balance for purpose of tiers will not include the balances in any other Customer Deposit Account that has been linked to other Scottrade brokerage accounts or available cash balances in your Scottrade brokerage account. Over any given period, the interest rates paid by the Program Banks in the BDP may be lower than deposit accounts offered outside of the program or non-FDIC insured investments. Interest rates, tier levels and factors affecting customer tier levels may be changed or eliminated by Scottrade at any time and without prior notice to you. Interest on your Customer Deposit Account is calculated based on the average monthly balance method. Interest accrues daily and will be posted to your Customer Deposit Account on the last day of each month.

**7. Financial Benefits to Scottrade.** Scottrade receives a fee from each non-affiliated Program Bank, and may receive a fee from Scottrade Bank. The amount of fee received by Scottrade will affect the interest rate paid by the Program Bank (including Scottrade Bank) on your Customer Deposit Account. Other than the applicable fees we charge pursuant to the terms and conditions that govern your Scottrade brokerage account (collectively, your "Brokerage Agreement"), there will be no charges, fees or commissions imposed on your account for the BDP feature. In addition to Scottrade, other service providers will receive fees from each Program Bank, including Scottrade Bank. Scottrade Bank will receive substantial deposits from the BDP at a price that may be less than other alternative funding sources available to it. Deposits in BDP Accounts at Scottrade Bank provide a stable source of funds for Scottrade Bank. Scottrade Bank intends to use the funds in the BDP Accounts to support its investments, lending activities and other approved activities. As with other depository institutions, the profitability of Scottrade Bank is determined in large part by the difference between the interest paid and other costs incurred by it on the BDP Accounts, and the interest or other income earned on its loans, investments, and other assets. Scottrade may have banking relationships with Program Banks that are not directly related to the BDP in which Scottrade may receive financial benefits.

**8. Notices and Information.** Scottrade may notify or send you information by means of letter, an e-mail, an entry on your brokerage account statement or by other reasonable means. Current interest rates, tier information, participating Program Banks and other information about the BDP is available by accessing your brokerage account at *www.scottrade.com* or contacting your local Scottrade branch office. All communications, including any complaints, regarding the BDP or your Customer Deposit Accounts should be directed to Scottrade - Bank Deposit Dept., P.O. Box 31759 St. Louis, MO 63131.

**9. Closing of Account** Scottrade or a Program Bank may, at any time, close BDP Accounts and/or your Customer Deposit Accounts. Upon closing, which includes the loss of eligibility described in paragraph 2 above, your Customer Deposit Account balance will be transferred to your Scottrade brokerage account, unless that account was previously closed, or, at the Program Bank's discretion, a check for the remaining balance, if applicable, may be mailed to you. If you close your Scottrade brokerage account, your Customer Deposit Accounts will also be closed and the funds in your Customer Deposit Accounts will be distributed to you according to the conditions of the Brokerage Agreement.

**10. Right of Set-Off** Scottrade may charge or set off funds in your BDP Accounts against indebtedness or obligations you may have to Scottrade. For further information on the right of Scottrade regarding such indebtedness or obligations, please see your Brokerage Agreement.

**11. Brokerage Agreement** You understand and agree that you continue to remain bound by your Brokerage Agreement and that all of the terms and conditions of your Brokerage Agreement, including the pre-dispute arbitration clause, shall also govern BDP Accounts; provided that, in the event that any of the terms and conditions of your Brokerage Agreement conflict with any of the provisions of this document (the "Scottrade Bank Deposit Program Terms, Conditions & Important Disclosures" or "Disclosure Statement Agreement"), the provisions of the Brokerage Agreement shall govern.

YOU AGREE TO CAREFULLY READ, UNDERSTAND AND ACCEPT THE TERMS AND CONDITIONS OF THIS DISCLOSURE STATEMENT AGREEMENT. YOU UNDERSTAND THAT BY CONTINUING TO MAINTAIN YOUR BROKERAGE ACCOUNT WITHOUT OBJECTING TO THE USE OF THE BDP ACCOUNTS, YOU ARE ACCEPTING THIS DISCLOSURE STATEMENT AGREEMENT AND YOU WILL BE LEGALLY BOUND BY ITS TERMS AND CONDITIONS.

**IN THE CIRCUIT COURT OF JACKSON COUNTY**
**AT INDEPENDENCE, MISSOURI**

Annette Mackey Bartle, on behalf of )
Herself and other members of the )
Putative class, )
    Plaintiff/Petitioner, )
VS. ) Case No.:2016-CV02520
  )
TD Ameritrade Holdings Corp., ) Division No.: 17
    Defendant/Respondent. )

## MOTION FOR APPOINTMENT OF PRIVATE PROCESS SERVER

COMES NOW Plaintiff/Petitioner, by and through counsel, and pursuant to Local Rule 4.9 of Jackson County Court Rules, hereby moves for the appointment of HPS Process Service & Investigations, Inc.:

| Name | PPS | Name | PPS |
|---|---|---|---|
| Will Acree | PPS20-0275 | Charles Casey | PPS20-0300 |
| Jan Adams | PPS20-0276 | George Castillo | PPS20-0301 |
| Roger Adams | PPS20-0277 | Fidel A Cervantes | PPS20-0302 |
| Randy Adkins | PPS20-0225 | Trenia Cherry | PPS20-0303 |
| Bobby Ali | PPS20-0278 | Joyce Clemmons | PPS20-0304 |
| Gregory Allen | PPS20-0279 | John Clor | PPS20-0305 |
| Victor Aponte | PPS20-0280 | Kathleen Clor | PPS20-0306 |
| Brandon Aschenbrenner | PPS20-0281 | Chad Compton | PPS20-0307 |
| Julia Ascorra | PPS20-0282 | Kenneth V Condrey | PPS20-0308 |
| Teresa Bailly | PPS20-0283 | Sharon R Condrey | PPS20-0309 |
| Joseph Baska | PPS20-0284 | Theodore Cordasco | PPS20-0310 |
| Robert Bassler | PPS20-0578 | Cesar Corral | PPS20-0311 |
| Carrington Bell | PPS20-0012 | George H Covert | PPS20-0312 |
| George Bell | PPS20-0286 | Dennis Dahlberg | PPS20-0026 |
| Carlos Bialet | PPS20-0579 | Mary Dahlberg | PPS20-0027 |
| Dianna Blea | PPS20-0287 | Patricia Dambach-Cirko | PPS20-0313 |
| Richard J Blea | PPS20-0288 | Bert Daniels, Jr. | PPS20-0028 |
| Robert Blixt | PPS20-0289 | Alterck Davenport | PPS20-0314 |
| Brent Bohnhoff | PPS20-0014 | Richard Davis | PPS20-0029 |
| Ann Bollino | PPS20-0291 | Duane D Day | PPS20-0315 |
| Donnie C Briley | PPS20-0292 | Gerald R Deadwyles | PPS20-0316 |
| Kathy Broom | PPS20-0293 | Bryce Dearborn | PPS20-0317 |
| Kenneth Brown | PPS20-0294 | Robert DeLacy, Jr. | PPS20-0318 |
| Douglas S Brower | PPS20-0580 | Robert E DeLacy, III | PPS20-0319 |
| Hester Bryant | PPS20-0019 | Kathleen Dnunno | PPS20-0320 |
| Nicholas Bull | PPS20-0020 | Marrissa Doan | PPS20-0034 |
| James F Burke | PPS20-0296 | Claudia Dohn | PPS20-0321 |
| Randy Burrow | PPS20-0021 | Dale Dorning | PPS20-0322 |
| Gory Burt | PPS20-0022 | Valentina Dorning | PPS20-0323 |
| Maurice Burton | PPS20-0298 | Catherine Drake | PPS20-0324 |
| Steve Butcher | PPS20-0581 | Alex Duaine | PPS20-0325 |
| William Caputo | PPS20-0299 | Roland Duff | PPS20-0326 |
| Kyle Carter | PPS20-0023 | Rochelle D Earthrise | PPS20-0327 |

| | | | |
|---|---|---|---|
| Daniel Eberle | PPS20-0328 | Gary F Hodges | PPS20-0363 |
| Shawn Edwards | PPS20-0035 | Alex Holland | PPS20-0057 |
| Jessica Ellison | PPS20-0330 | Leonard Horseman | PPS20-0364 |
| Abel Emiru | PPS20-0331 | Ulonda Howard | PPS20-0365 |
| Donald C Eskra, Jr. | PPS20-0332 | Martin Hueckel | PPS20-0366 |
| Leticia Estrada | PPS20-0333 | Damion Hugher | PPS20-0367 |
| David S Felter | PPS20-0334 | William Humble | PPS20-0590 |
| William Ferrell | PPS20-0037 | Mary Hurley | PPS20-0058 |
| Robert Finley | PPS20-0335 | George Illidge | PPS20-0368 |
| Stephen Folcher | PPS20-0336 | Frank James | PPS20-0369 |
| Ryan D Fortune | PPS20-0337 | Matthew Jankowski | PPS20-0370 |
| Chris Fowler | PPS20-0338 | Betty Johnson | PPS20-0059 |
| James Frago | PPS20-0038 | Edward Johnson | PPS20-0060 |
| John Frago | PPS20-0039 | James Johnson | PPS20-0061 |
| Kelsey Garrett | PPS20-0582 | Jordan Johnson | PPS20-0372 |
| Thomas Garrett | PPS20-0339 | Justin L Johnson | PPS20-0373 |
| Andrew Garza | PPS20-0041 | Randy Johnson | PPS20-0374 |
| Charles Gay | PPS20-0340 | Samuel Johnson | PPS20-0375 |
| Richard Gerber | PPS20-0341 | Haile Kahssu | PPS20-0376 |
| Louis Gerrick | PPS20-0342 | Kenneth Kearney | PPS20-0377 |
| Paul Gizel | PPS20-0343 | Michael Keating | PPS20-0378 |
| Ronda Godard | PPS20-0344 | Christopher Keilbart | PPS20-0591 |
| Adam Golden | PPS20-0345 | Elizabeth A Kidd | PPS20-0379 |
| Bradley Gordon | PPS20-0042 | Donna Jo King | PPS20-0371 |
| Tom Gorgone | PPS20-0044 | Kenneth Klewicki | PPS20-0380 |
| Paul O Grimes | PPS20-0348 | George Kotsiras | PPS20-0592 |
| Charles Gunning | PPS20-0046 | Wyman Kroft | PPS20-0381 |
| Aloysivs Guy, Sr. | PPS20-0583 | Jo Ann Lane | PPS20-0382 |
| David Hahn | PPS20-0584 | Linda Langville | PPS20-0593 |
| Eric Hahn | PPS20-0585 | Eric B Layton | PPS20-0383 |
| Stefanie Hahn | PPS20-0586 | Kristie Lewis | PPS20-0384 |
| Darnell Hamilton | PPS20-0143 | John D Lichtenegger | PPS20-0385 |
| Kimberly Hamilton | PPS20-0351 | Bert Lott | PPS20-0386 |
| Natalie Hawks | PPS20-0050 | Robert Lutren | PPS20-0387 |
| Larry Haynes | PPS20-0352 | Daniel Maglothin | PPS20-0069 |
| Douglas Hays | PPS20-0051 | Matthews J Manlich | PPS20-0388 |
| Grace Hazell | PPS20-0353 | Robert Manning | PPS20-0389 |
| Richard Heimerich, Jr. | PPS20-0354 | Deborah Martin | PPS20-0072 |
| Stephen Heitz | PPS20-0052 | Michael Martin | PPS20-0073 |
| Charles Helms | PPS20-0356 | Ryan Martin | PPS20-0193 |
| Austen Hendrickson | PPS20-0357 | Susie Martin | PPS20-0390 |
| Jonathan Hennings | PPS20-0358 | Thomas Matthews | PPS20-0391 |
| Jesse J Hernandez | PPS20-0359 | Casey McKee | PPS20-0076 |
| Michael Hibler | PPS20-0360 | Michael McMahon | PPS20-0392 |
| Anthonio Hightower | PPS20-0361 | Michael Meade | PPS20-0393 |
| Cherrod T Hindsman | PPS20-0362 | Michael Meador | PPS20-0077 |
| James Hise | PPS20-0054 | Kenny Medlin | PPS20-0078 |

| | |
|---|---|
| Arsalan Memon | PPS20-0396 |
| Eric Mendenhall | PPS20-0397 |
| Jenna Mendoza | PPS20-0398 |
| Matthew Millhollin | PPS20-0081 |
| Carla M Monehain | PPS20-0400 |
| Carlos Moreno | PPS20-0401 |
| Michael S Morrison | PPS20-0402 |
| Zachary P. Mueller | PPS20-0596 |
| Kelly Murski | PPS20-0403 |
| Andrew Myers | PPS20-0087 |
| Frederick Myers | PPS20-0088 |
| James Myers | PPS20-0089 |
| Stephanie Myers | PPS20-0090 |
| Paul Nardizzi | PPS20-0404 |
| Wendy Neff | PPS20-0405 |
| Christopher New | PPS20-0091 |
| Jillian Newkirk | PPS20-0406 |
| Jeremy Nicholas | PPS20-0092 |
| Michael Noble | PPS20-0093 |
| Michael C Nolon | PPS20-0409 |
| Colter Norris | PPS20-0410 |
| Dennis Norris | PPS20-0411 |
| Kody Norris | PPS20-0412 |
| Trinity Olson | PPS20-0413 |
| Craig Palmer | PPS20-0414 |
| Cynthia Paris | PPS20-0415 |
| Douglas W Patterson | PPS20-0416 |
| Antonio Perez | PPS20-0417 |
| Jaron Perkins | PPS20-0418 |
| Anha Pham | PPS20-0419 |
| Thai Pham | PPS20-0420 |
| Bonnie Phillippi | PPS20-0597 |
| Gregory Piazza | PPS20-0421 |
| Vincent A Piazza | PPS20-0422 |
| Brian T Pierce | PPS20-0423 |
| Timothy Pinney | PPS20-0424 |
| Joshua Pitts | PPS20-0425 |
| Craig Podgurski | PPS20-0598 |
| Rocellious Pope | PPS20-0426 |
| Nancy A Porter | PPS20-0427 |
| Andre Powell | PPS20-0428 |
| Benjamin Purses | PPS20-0429 |
| Richard Ramirez | PPS20-0430 |
| Charles Reardon | PPS20-0431 |
| Derek L Reddick | PPS20-0432 |
| Angela Reed | PPS20-0433 |
| Christopher Reed | PPS20-0434 |

| | |
|---|---|
| Edward Reed | PPS20-0435 |
| Betty G Rice | PPS20-0436 |
| Karen L Rice | PPS20-0437 |
| Cheryl Richey | PPS20-0439 |
| Terri Richards | PPS20-0106 |
| Debra Rios | PPS20-0440 |
| David M Roberts | PPS20-0206 |
| Patricia Roberts | PPS20-0207 |
| Jeroy Robinson | PPS20-0441 |
| Sammie Robinson | PPS20-0108 |
| Adrienne Rodriguez | PPS20-0442 |
| Gabriel Rodriguez | PPS20-0443 |
| Mateo F Rodriguez | PPS20-0444 |
| Richard C Ross | PPS20-0445 |
| Melissa Ruiz | PPS20-0446 |
| Antonio Ruque | PPS20-0447 |
| Geena Christine Rupp | PPS20-0599 |
| Edna Russell | PPS20-0110 |
| Lee H Russell | PPS20-0448 |
| Mark A Russell | PPS20-0449 |
| John Sadler | PPS20-0450 |
| Ligno Sanchez | PPS20-0451 |
| Virginia Saxon-Ford | PPS20-0452 |
| Greg Schermerhorn | PPS20-0453 |
| Brenda Schiwitz | PPS20-0111 |
| Michael Schuller | PPS20-0454 |
| Nathaniel Scott | PPS20-0455 |
| Grant Selvey | PPS20-0600 |
| Quratulain Shoukat | PPS20-0456 |
| Jeremy Small | PPS20-0457 |
| Monica Smith | PPS20-0458 |
| Anthony Spada | PPS20-0459 |
| Melissa Spencer | PPS20-0460 |
| Jamie Stallo | PPS20-0461 |
| Marc A Starks | PPS20-0462 |
| Barbara Steil | PPS20-0463 |
| Kelvin Stinyard | PPS20-0464 |
| Randy Stone | PPS20-0117 |
| Sonja Stone | PPS20-0118 |
| Steven Stosur | PPS20-0465 |
| Robert T Stover | PPS20-0006 |
| Jeanie Straessler | PPS20-0466 |
| Chance Strawser | PPS20-0467 |
| David Taliaferro | PPS20-0119 |
| Ramona Rose Talvacchio | PPS20-0468 |
| Katherina M Tan | PPS20-0469 |
| Berhane Tassaw | PPS20-0470 |

| | |
|---|---|
| Michael Taylor | PPS20-0120 |
| Courtney S. Thiemann | PPS20-0601 |
| Robert Hayes Thomas | PPS20-0602 |
| Walter Thomas | PPS20-0603 |
| William Wyatt Thomas | PPS20-0604 |
| Christina Tiffany | PPS20-0471 |
| Stephen M Troutz | PPS20-0472 |
| Clinton Turpen | PPS20-0473 |
| Henry J Valladares Cruz | PPS20-0474 |
| Margarita Vasquez | PPS20-0475 |
| Robert E Vick, II | PPS20-0476 |
| Bradley Votaw | PPS20-0477 |
| Joseph T Wachowski | PPS20-0478 |

| | |
|---|---|
| Ambiko Wallace | PPS20-0479 |
| Vance M Warren, Sr. | PPS20-0480 |
| Barbara West | PPS20-0481 |
| Pamela K Wheetley | PPS20-0007 |
| Jennifer White | PPS20-0482 |
| Gregory Willing | PPS20-0130 |
| Conni Wilson | PPS20-0131 |
| Deborah A Wilson | PPS20-0484 |
| Jerry Wilson | PPS20-0132 |
| Mitchell Wirth | PPS20-0485 |
| Debra Woodhouse | PPS20-0133 |
| Jerry Wooten | PPS20-0487 |
| Kimary Ann Zappia | PPS20-0606 |

as private process servers in the above-captioned matter. In support of said motion, Plaintiff/Petitioner states that the above-named individuals are on the Court's list of approved process servers and the information contained in their applications and affidavits on file is current and still correct.

BARTLE & MARCUS LLC

By /s/ David L. Marcus
David L. Marcus, MO Bar #47846
BARTLE & MARCUS LLC
116 W. 47th Street, Suite 200
Kansas City, MO 64112
Telephone: 816.256.4699
Fax: 816.222.0534
Dmarcus@bmlawkc.com

and

THE LAW OFFICE OF JARED A. ROSE

Jared A. Rose, MO Bar #60128
919 West 47th Street
Kansas City, MO 64112
Phone: 816.221.4335
Fax: 816.873.5406
jared@roselawkc.com

**ATTORNEYS FOR PLAINTIFF**

## ORDER FOR APPOINTMENT OF PRIVATE PROCESS SERVER

It is hereby ordered that Petitioner/Plaintiff's Motion for Appointment of Private Process Server is sustained and the above named individuals are hereby appointed to serve process in the above captioned matter.

DATE: _____ 28-Jan-2020 _____

### DEPUTY COURT ADMINISTRATOR